**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Petitioner,**

v.

**Jack BOBKER, Respondent.**

**No. 86 Civ. 0439 (EW).**

United States District Court,
S.D. New York.

June 14, 1986.

Mandel, Wiener & Block, New York City, for petitioner; Meryl E. Wiener, Philip M. Mandel, of counsel.

D'Andrea & Goldstein, Mount Vernon, N.Y., for respondent; Robert Goldstein, of counsel.

S.E.C., Washington, D.C., amicus curiae; Daniel L. Goelzer, Jacob H. Stillman, David A. Sirignano, Sheila M. Barry, of counsel.

### OPINION

EDWARD WEINFELD, District Judge.

Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") petitions to vacate an arbitration award in favor of Jack Bobker on the ground that it is in "manifest disregard of the law." Bobker, a customer of Merrill Lynch for 18 years, was a sophisticated trader in the stock market at the time of the events which were the subject of the arbitration proceeding. For the reasons set forth herein, the Court grants Merrill Lynch's petition.

On March 8, 1985, respondent Bobker instructed his Merrill Lynch account executive to tender to Phillips Petroleum Co. ("Phillips") all of his 4,000 shares of Phillips stock in response to a Phillips tender offer to purchase 72,580,000 of its shares on a pro rata basis for $62 per share. Pursuant to his instructions, Merrill Lynch tendered his shares on that day. On March

11th, three days later, Bobker instructed a Merrill Lynch representative other than the one who regularly handled his transactions, to sell short 2,000 shares of Phillips stock in order to take advantage of the rise in the market price of Phillips stock following the tender offer. Two days before the March 15th proration date [1] Merrill Lynch informed Bobker that it had cancelled the short sale because the sale violated the firm's policy. Bobker sought to effectuate the short sale through a broker at Prudential Bache but was unsuccessful when Bache was unable to procure the necessary shares.

Bobker instituted an arbitration proceeding before a panel of arbitrators selected in accordance with the rules of the New York Stock Exchange seeking to recover $23,000 in profits allegedly lost as a result of Merrill Lynch's cancellation of the short sale. According to Bobker, he would have realized these profits if he had been able to complete the short sale at $48.50 per share and then cover the short sale with Phillips stock purchased after the proration date passed, when Phillips stock had declined in value to approximately $37.00 per share. After two days of hearings, the three arbitrators awarded Bobker $12,500. Merrill Lynch now contends that the award is in manifest disregard of the law because Bobker's attempted short sale would have violated Rule 10b–4.

At the Court's request, the Securities and Exchange Commission ("SEC") submitted an amicus brief on whether a person violates Rule 10b–4 if he tenders all the shares he owns in a company and then attempts a short sale of the same security.

## DISCUSSION

As this Court has said, "the Court's power to review the arbitrators' award is 'severely limited'.... It is not the function of a district court to review the record of an arbitration proceeding for mere errors of law or fact." [2] Nevertheless, an arbitration award may be vacated on the grounds set forth in the Arbitration Act, 9 U.S.C. § 10, or if the arbitrators acted in "manifest disregard" of the law.[3] As our Court of Appeals recently noted, "Precisely what the 'manifest disregard' test requires is not yet clear. However, it does require 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law.'" [4] The arbitrators must be found to have "'understood and correctly stated the law but proceeded to ignore it.'" [5]

In 1968, the SEC promulgated Rule 10b–4 in response to a practice known as "short tendering." [6] A short tender occurs when a shareholder tenders more shares than he actually owns, during a tender offer for less than all of a company's shares, resulting in a disproportionate number of his shares being accepted by the offeror on a pro rata basis at the premium tender offer price. The Rule, which prohibited a person from tendering any security for his own account unless he owned the security at the time of tender,[7] was de-

1. The proration date is the last date on which shareholders may tender their securities in response to an offer to purchase less than all of the corporation's shares.

2. *Dundas Shipping & Trading Co., Ltd. v. Stravelakis Bros.,* 508 F.Supp. 1000, 1003–04 (S.D.N.Y. 1981).

3. *See Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 187–88, 98 L.Ed. 168 (1953).

4. *Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 892 (2d Cir.1985) (per curiam) (quoting *Drayer v. Krasner,* 572 F.2d 348, 352 (2d Cir.), *cert. denied,* 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978)); *see also Sobel v. Hertz, Warner & Co.,* 469 F.2d 1211, 1214 (2d Cir.1972).

5. *Siegel,* 779 F.2d at 893 (quoting *Bell Aerospace Co. v. Local 516,* 356 F.Supp. 354, 356 (W.D.N.Y. 1973), *rev'd on other grounds,* 500 F.2d 921 (2d Cir.1974)); *see also A/S Siljestad v. Hideca Trading, Inc.,* 541 F.Supp. 58, 60 (S.D.N.Y.1981), *aff'd,* 678 F.2d 391 (2d Cir.1982).

6. Securities Exchange Act Release No. 8321 (May 28, 1968), [1967–69 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 77,558, 33 Fed.Reg. 8269 (1968).

7. A person owned securities, for purposes of the Rule, only to the extent he was "net long" in the securities. Rule 10b–4(b), 17 C.F.R. § 240.10b–4(b) (1983). The criteria employed to determine ownership of shares within the meaning

signed to ensure equal opportunity for tendering shareholders to participate in the proration pool.

In 1984, the Commission amended Rule 10b–4 to prohibit "hedged tendering." [8] Prior to the amendment, investors were reducing the risks associated with pro rata acceptance of tendered shares by tendering the shares they owned and then, prior to the proration date, selling a portion of the tendered shares in the market. The SEC adopted the amendment because hedged tendering was viewed as having "the same purpose and effect as short tendering," and was therefore inconsistent with the goal of promoting "equality of opportunity and risk for all tendering securityholders." [9] The amended Rule makes it "unlawful for any person to tender any security unless he owns the securities tendered both at the time of tender and at the end of the proration acceptance period." [10] The Rule provides:

(b) It shall constitute a "manipulative or deceptive device or contrivance" and a "fraudulent, deceptive, or manipulative act or practice" as those terms are used in sections 10(b) and 14(e) of the Act, respectively, for any person acting alone or in concert with others, directly or indirectly, to tender any subject security in a partial offer:

(1) For his own account unless at the time of tender, and at the end of the proration period ... he owns: (i) The subject security and will deliver or cause to be delivered such security for the purpose of tender to the person making the.

offer within the period specified in the offer.... [11]

The Rule states that "a person shall be deemed to own a security for purposes of this rule only to the extent that he has a net long position in such security." [12] Because a tendering shareholder must be net long both at the time of tender and on the proration date, a person who tenders all of his securities and then sells a portion of the tendered shares must repurchase an equal number of securities or withdraw a portion of the tender *prior* to the proration date to avoid violating the Rule. [13]

By tendering all 4,000 of his shares of Phillips stock and then selling short 2,000 shares of that stock, Bobker would have been net long only 2,000 shares on the proration date and in violation of Rule 10b–4 if the short sale had not been cancelled by Merrill Lynch or if Bobker had failed to repurchase the 2000 shares he sold short prior to the proration date. While Bobker had no intention of repurchasing the 2000 shares prior to the proration date, he nevertheless argues that his attempted transaction would not have violated Rule 10b–4 because the tender of 4,000 shares and the short sale of 2,000 shares were independent transactions. Bobker bases this contention on a claim that he would have used cash to purchase shares to cover the short sale; that he would not have used any of the 4,000 tendered shares to cover the short sale, leaving him net long 4,000 shares on the proration date. What he claims he would have

of Rule 10b–4 are the same as those employed in interpreting Rule 10a–1. *See* Securities Exchange Act Release No. 8224 (Jan. 3, 1968), [1967–69 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 77,515. For the 1938 release interpreting Rule 10a–1, *see* Securities Exchange Act Release No. 1571 (Feb. 5, 1938), 11 Fed.Reg. 10,969 (1946).

**8.** Securities Exchange Act Release No. 20799 (Mar. 29, 1984), [1984 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 83,601, at 86,711 (1984).

**9.** *Id.* at 86,712.

**10.** *Id.* at 86,714.

**11.** 17 C.F.R. § 240.10b–4 (1985). The Rule was amended again in 1985 to prohibit hedged tendering through the use of standardized call options. *See* Securities Exchange Act Release No. 21782 (Feb. 22, 1985), 32 S.E.C. Docket 918.

**12.** For purposes of determining whether a person is "net long," the number of shares tendered is offset by the number of shares sold short. The balance or "net" amount must equal or exceed the number of shares tendered.

**13.** *See* Securities Exchange Act Release No. 20799 (Mar. 29, 1984), [1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 83,601, at 86,714.

done, however, is not a substitute for the factual situation.[14]

Regardless of whether Bobker would have purchased shares to cover the short sale, Rule 10b–4 requires that the tendering shareholder own the "security" on the proration date, not a cash equivalent. Thus he was required to own 4,000 shares. Bobker's contention that his short sale need not be offset against his tendered shares lacks support in the Rule and in the SEC's releases. By definition, "net long" requires that a shareholder's long and short positions be netted against each other, without regard for the independence of the transactions.

Finally, even if Bobker covered the short sale by purchasing shares with cash after the proration date, his transaction would have resulted in the kind of disparate treatment of tendering shareholders Rule 10b–4 was intended to prevent. Bobker would have received not only the above-market tender price for the half of his shares accepted by Phillips,[15] but also the profits realized on his short sale of 2,000 shares. Thus, Bobker would have received a premium price for all 4,000 shares, rather than just those shares accepted by Phillips. A shareholder who did not engage in hedged tendering would receive a premium price only for the half of his shares accepted by Phillips. Having elected to participate in the proration pool, Bobker was required by

Rule 10b–4 to do so on an equal basis with all other tendering shareholders.

Bobker's attempted short sale was contrary to both the letter and the spirit of Rule 10b–4. The SEC, whose interpretation of the statute and regulations is entitled to considerable deference,[16] contends in its amicus brief that the history of Rule 10b–4 makes clear that if Merrill Lynch had not cancelled Bobker's short sale and Bobker had failed to repurchase the shares or withdraw them from the tender prior to the proration date, the short sale would have violated the Rule.

Bobker's post hoc characterization of the tender and short sale as independent transactions is nothing more than a thinly veiled attempt to cash in on a scheme designed to obtain $23,000 in profits he was not entitled to receive. The arbitrators were aware of the Rule and its purpose [17] yet proceeded to ignore it, despite the fact that the illegality of the proposed transaction was pressed by Merrill Lynch. The arbitrators' disregard of the law is underscored by the fact that although Bobker claimed he lost profits totalling $23,000,[18] the arbitrators, without explanation, reduced the request by exactly fifty percent (after allowing for costs and expenses). It appears that they not only disregarded the law, but acted arbitrarily by splitting the difference.

Permitting this award to stand would have the unacceptable result of penalizing

**14.** While Bobker claims he would have covered the short sale with cash to purchase shares, he never provided Merrill Lynch with the funds to do so. *See* Transcript of Arbitration Proceedings, at 44. Moreover, Bobker told the arbitrators that he intended to use cash rather than the unaccepted shares returned by Phillips only if he was able to purchase the shares at a favorable price after the proration date. *Id.* at 37–38.

**15.** Phillips accepted 2,179 of the 4,000 shares tendered by Bobker.

**16.** *See E.I. DuPont deNemours & Co. v. Collins*, 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234–35, 53 L.Ed.2d 100 (1977); *United States v. National Ass'n of Securities Dealers*, 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975); *Continental Stock Transfer & Trust Co. v. SEC*, 566 F.2d 373, 374 n. 1 (2d Cir.1977) (per curiam); *see also Hayfield Northern R.R. v. Chicago &*

*North Western Transp. Co.*, 467 U.S. 622, 634, 104 S.Ct. 2610, 2618, 81 L.Ed.2d 527 (1984); *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Commodity Exchange, Inc. v. Commodity Futures Trading Comm'n*, 543 F.Supp. 1340, 1354 (S.D.N.Y.1982), *aff'd,* 703 F.2d 682 (2d Cir.1983). *But see International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979) (citing cases).

**17.** *See* Transcript of Arbitration Proceedings, at 76–77.

**18.** As noted above, Bobker's claim was based on the difference between the market price of the shares at the time of his attempted short sale and the market price a few days after the tender offer proration date.

Merrill Lynch for acting in accordance with the law. Accordingly, the Court finds that the award of $12,500 to Bobker was in manifest disregard of the law and is hereby vacated.

So ordered.