MERRILL LYNCH, PIERCE, FENNER
& SMITH, INC., Petitioner-Appellee,

v.

Jack BOBKER, Respondent-Appellant.

No. 178, Docket 86–7513.

United States Court of Appeals,
Second Circuit.

Argued Oct. 30, 1986.

Decided Dec. 23, 1986.

Robert Goldstein, Mount Vernon, N.Y. (D'Andrea & Goldstein, Mount Vernon, N.Y., of counsel), for respondent-appellant.

Philip M. Mandel, New York City (Mandel, Wiener & Block, New York City, of counsel), for petitioner-appellee.

Before MANSFIELD, MESKILL and MINER, Circuit Judges.

MANSFIELD, Circuit Judge:

Jack Bobker ("Bobker") appeals from an order of the Southern District of New York, Edward Weinfeld, J., setting aside an arbitration award of $12,500 in his favor against Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrill Lynch"). The award, based on Merrill Lynch's cancellation of a short sale of 2,000 shares of Phillips Petroleum Company ("Phillips") made on Bobker's behalf, was set aside as being in "manifest disregard of the law." *See Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 187–88, 98 L.Ed. 168 (1953). We reverse.

The facts are undisputed. Bobker owned 4,000 shares of Phillips common stock. On March 8, 1985, Phillips made an offer to its shareholders to purchase 72,850,000 shares of its common stock on a *pro rata* basis, provided the stock was tendered to it on or before March 15, 1985, the proration date. Since Phillips had more than 140,000,000 common shares outstanding, it was likely that there would be an over-subscription in response to the offer, i.e., that the number tendered would exceed the 72,850,000 shares which Phillips offered to buy, in which event it would, on a *pro rata* basis, purchase from each tendering stockholder a proportionate percentage of his tendered shares.

On March 8, 1985, Bobker instructed his broker, Merrill Lynch, with whom he maintained an account, to tender his 4,000 shares in acceptance of Phillips' offer, which was done immediately. On March 11, 1985, Bobker instructed Merrill Lynch to sell short 2,000 shares of Phillips common stock at the then market price of $48.50 per share. A "short sale" is a sale of shares of stock not owned by the seller but borrowed by him from someone else for the purpose of effectuating the sale. Merrill Lynch on the same date executed the short-sale order and mailed a confirmation to Bobker. However, on March 13, 1985, Merrill Lynch cancelled the transaction and informed Bobker that it had done so because the sale violated the firm's policy. Bobker then unsuccessfully sought to consummate the short sale of 2,000 shares through the brokerage firm of Prudential Bache but was unsuccessful because the latter was unable to procure the 2,000 shares needed to effectuate the sale. If the short-sale order had been executed by either Merrill Lynch or Prudential Bache, Bobker planned to purchase 2,000 shares in the market after the proration date.

On March 18, 1985, Phillips reported that 94% of all outstanding shares had been tendered by the proration date, March 15, and that it was accordingly purchasing 54% of the shares tendered, which would amount to 72,850,000 shares, the amount its offer had committed it to buy. The market price of Phillips common stock thereupon dropped to $36–$37 per share. On April 23, 1985, Bobker, claiming that Merrill Lynch's refusal to execute the 2,000 shares short-sale prevented him from making a profit of $23,000 (which he would have realized by selling the shares short at $48.50 per share on March 13 and buying an equal amount back on March 18 at $37 per share), submitted a Statement of Claim to the New York Stock Exchange. Merrill Lynch denied liability on the ground that it was not required to carry out the short-sale because to do so would have constituted a manipulative practice known as a "hedged

tender" in violation of § 10(b) of the Securities Exchange Act ("Act") and Rule 10b–4 promulgated by the Securities Exchange Commission ("SEC") thereunder. Briefly, Rule 10b–4 requires that a shareholder have a "net long" position in a security both on the date the security is tendered and on the date the offer expires.[1] A "net long" position is not defined in Rule 10b–4 but, according to a 1938 SEC Release (see p. 934 *infra*) it is the balance of shares owned by a person after offsetting against shares owned by him any shares sold short by him.

The arbitration panel, consisting of three persons appointed pursuant to the rules of the New York Stock Exchange, held two sessions, the first on October 17, 1985, and the second on November 12, 1985. At the first session they received opening statements and evidence, including the testimony of Bobker. The second hearing dealt mainly with the proper interpretation of Rule 10b–4. The parties also submitted briefs with respect to the question of whether Bobker's proposed short sale would have violated Rule 10b–4. It was Merrill Lynch's position before the arbitrators, as it is here, that the proposed short sale would have violated Rule 10b–4 because it would have had the effect of reducing Bobker's net long position to 2,000 shares when he had tendered 4,000 shares, and that the sale would therefore give him a disproportionate percentage of stock to be purchased from him by Phillips, as compared with the percentage to be purchased from other tendering stockholders. Bobker, on the other hand, argued that the 2,000–share short-sale would not have violated Rule 10b–4 because it was to be an independent transaction, financed separately by him.

During the second arbitration session, which was devoted entirely to the proper interpretation of Rule 10b–4, the arbitrators, following summations, engaged in an extended colloquy (20 pages of the record) with counsel. Repeatedly, one or more arbitrators expressed concern over the propriety of forbidding a stockholder who had tendered shares from selling other borrowed shares short in a transaction independently financed by him.[2] Merrill Lynch argued that since the purchaser of the 2,000 shares sold short by Bobker "could tender into the proration also" the effect would be to enlarge the proration pool and thereby diminish the tendering stockholders' portion of the pool. In her words, "[i]t is unfair to the small investor to let people tender and short at the same time, it makes

---

1. Rule 10b–4 provides in relevant part, that: "It shall constitute a 'manipulative or deceptive device or contrivance' and a 'fraudulent, deceptive, or manipulative act or practice' as those terms are used in sections 10(b) and 14(e) of the Act, respectively, for any person ... to tender any subject security in a partial offer: (1) For his own account unless at the time of tender, and at the end of the proration period or period during which securities are accepted by lot (including any extensions thereof), he owns: (i) The subject security ... or (ii) an equivalent security...." 17 C.F.R. § 240.10b–4.

Rule 10b–4 also provides that "a person shall be deemed to own a security for the purposes of [Rule 10b–4] only to the extent that he has a *net long* position in such security." *Id.* (emphasis added).

2. For example, Arbitrator Robert Sullivan observed:

"MR. SULLIVAN: ...

I think you will admit that selling short is a device in the brokerage business which tends to make money for people sometimes, but it is a device.

I think you will agree that this is a device that should be available to everybody.

MS. COTTER: Correct.

MR. SULLIVAN: Why, then, if you are selling short, and let's take the figures that we have got, and if I sell short 2,000 shares, there is no tender involved, there is nothing at all?

I have to put up $97,000. The person who buys it has to put up $97,000. If I do that, whether Phillips is tendered or not does not matter.

Up here I own 4,000 shares. I want to tender those 4,000 and I do. I tender the 4,000. If I tried to sell short up here, I am going to be short either 2,000, but if I sell short down here and I post the 97, what does that have to do with this?

My question is, why should anybody who owns Phillips stock, that is, want to tender it, be eliminated from the possibility of selling short if they are going to do it on the same basis as anybody else?"

the proration pool bigger, the small investor is going to get a smaller portion of his stock accepted" while the "big investor or market professional" could take advantage of the market to make money on a short sale. Arbitrator Sullivan indicated dissatisfaction with this answer because short sales, which any person (whether or not a present owner of Phillips stock) could make, would not affect the size of the proration pool. He concluded:

"MR. SULLIVAN: Then it comes down to what you both said initially ... that it is a matter of interpretation of the law, ... and we now hopefully have to come up with the right answer on this law, and it is a very gray area. I think this is just going to be a deliberation we are going to have to go through."

On November 12, 1985, the arbitration panel rendered its decision, without any written opinion, in favor of Bobker, awarding him $12,500 ($11,500 for lost profits and $1,000 for return of deposit and costs).

On January 13, 1986, Merrill Lynch filed in the Southern District of New York a petition to vacate the arbitration award on the ground that it was in manifest disregard of the law. After receiving briefs from the parties and a requested brief from the SEC, Judge Weinfeld filed his decision and order vacating the award on that ground, 636 F.Supp. 444. After reviewing the history of Rule 10b-4 and its amendments, Judge Weinfeld held that the term "net long" as used in the Rule required "that a shareholder's long and short positions be netted against each other, without regard for the independence of the transactions" and that "even if Bobker covered the short sale by purchasing shares with cash after the proration date, his transaction would have resulted in the kind of disparate treatment of tendering shareholders Rule 10b-4 was intended to prevent", in which he would receive "not only the above-market tender price for the half of his shares [54%] accepted by Phillips but also the profits realized on his short sale of 2,000 shares." The court stated, "Bobker would have received a premium price for all 4,000 shares, rather than just those

shares [2,179 shares out of 4,000 tendered by Bobker] accepted by Phillips." Accordingly, Judge Weinfeld held that "the short sale would have violated the Rule" since it was "nothing more than a thinly veiled attempt to cash in on a scheme designed to obtain $23,000 in profits he was not entitled to receive." He concluded that the "arbitrators were aware of the Rule and its purpose yet proceeded to ignore it, despite the fact that the illegality of the proposed transaction was pressed by Merrill Lynch" and that they therefore acted in manifest disregard of the law. This appeal followed.

## DISCUSSION

"Manifest disregard of the law" by arbitrators is a judicially-created ground for vacating their arbitration award, which was introduced by the Supreme Court in *Wilko v. Swan*, 346 U.S. 427, 436-37, 74 S.Ct. 182, 187-88, 98 L.Ed. 168 (1953). It is not to be found in the federal arbitration law. 9 U.S.C. § 10. Although the bounds of this ground have never been defined, it clearly means more than error or misunderstanding with respect to the law. *Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 892-93 (2d Cir.1985); *Drayer v. Krasner*, 572 F.2d 348, 352 (2d Cir.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978); *I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424, 432 (2d Cir.1974). The error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term "disregard" implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it. *Bell Aerospace Company Division of Textron, Inc. v. Local 516*, 356 F.Supp. 354, 356 (W.D.N.Y. 1973), *rev'd on other grounds*, 500 F.2d 921 (2d Cir.1974). To adopt a less strict standard of judicial review would be to undermine our well established deference to arbitration as a favored method of settling disputes when agreed to by the parties. *United Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct.

1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Saxis Steamship Co. v. Multifacs International Traders, Inc.*, 375 F.2d 577 (2d Cir.1967). Judicial inquiry under the "manifest disregard" standard is therefore extremely limited. The governing law alleged to have been ignored by the arbitrators must be well defined, explicit, and clearly applicable. We are not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it.

Applying the foregoing principles here, the question is whether the arbitrators understood the terms and applicability of § 10(b) of the Securities Exchange Act and Rule 10b–4 promulgated thereunder and deliberately ignored them in making their award in favor of Bobker. Section 10(b) of the Act makes it unlawful for any person to use or employ, in connection with the purchase or sale of any nationally registered security, "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–4, as amended in 1984, states that it is a "manipulative or deceptive device or contrivance" and a "fraudulent, deceptive, or manipulative act or practice" for any person to tender any security in response to a partial offer "unless at the time of the tender, and at the end of the proration period" he owns the security. 17 C.F.R. § 240.10b–4. Rule 10b–4 further provides that "a person shall be deemed to own a security for purposes of this rule only to the extent that he has a net long position in such security." *Id.* SEC Rules do not define the term "net long." However, Securities Exchange Act Release No.

8224 (Jan. 3, 1968) [1967–69 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 77,515, states that the criteria for determining ownership are the same as those employed in interpreting Rule 10a–1 under the Act, 17 C.F.R. § 240.10a–1, relating to short sales. A 1938 Commission release interpreting Rule 10a–1 states that a net long position is determined by offsetting against shares owned any shares sold short by the same person. *See* Securities Exchange Act Release No. 1571 (Feb. 5, 1938), 11 Fed.Reg. 10,969, 10,970 (1946).

The SEC's reasons for adopting Rule 10b–4 were set forth in Securities Exchange Act Release No. 20799 [1984], Fed. Sec.L.Rep. (CCH) ¶ 83,601. Specifically, by promulgating Rule 10b–4, the Commission hoped to end certain practices whereby "market professionals were able to secure acceptance of a disproportionately large number of securities owned and tendered by them . . ." in a tender offer for less than all of a company's stock. These practices included "short tenders", whereby an investor tendered more shares than he actually owned, and "hedged tenders", whereby an investor sold shares after the initial tender but before the proration date. Both of these practices had the effect of diluting the *pro rata* acceptance of other investors because the pool of shares tendered was artificially increased, in the first case, due to the tender of shares which did not actually exist, and in the second case, due to the possibility that the same shares would be effectively tendered by two or more shareholders.

From the outset of the present dispute between the parties, Merrill Lynch's position, later supported by an SEC brief filed in the district court at the request of Judge Weinfeld, has been that Bobker's proposed short sale of 2,000 shares would have violated Rule 10b–4 because it would have reduced his "net long" position to 2,000 shares, while Bobker had tendered 4,000 shares.[3] The basic weakness in this posi-

---

**3.** It should be noted that Merrill Lynch did not assert this on March 13 as the basis for its cancellation of the short sale. Nor could it do

so, absent knowledge (which it did not then have) that Bobker would not, prior to the proration date (March 15), either withdraw from

tion, which appears to have been appreciated by the arbitration panel, is that the proposed short sale would not enable Bobker to tender more shares than he *actually* owned or to dilute the *pro rata* acceptance of shares tendered by other stockholders by causing the same shares to be tendered by two or more shareholders. The fact is that at all times Bobker owned outright the 4,000 shares tendered by him in response to Phillips' partial offer. The 2,000 shares that would separately be sold short by him were not part of the 4,000 shares owned by him but additional shares borrowed from a non-tendering shareholder. The purchaser of these shares would have the right to tender them or not as he saw fit. But even if that purchaser should tender the 2,000 shares, his tender would in no way increase the percentage acceptance of Bobker's 4,000 shares over that of other tendering Phillips stockholders. We disagree, therefore, with the district court's statement that Bobker's "transaction would have resulted in the kind of disparate treatment of tendering shareholders Rule 10b–4 was intended to prevent."

■ In short, there does not appear to have been anything "manipulative" or "deceptive" about the short sale proposed by Bobker. Nor would it violate the purpose of Rule 10b–4 as explicitly defined by the SEC, which was to prevent a shareholder from double-tendering stock in response to a partial offer and thus increase the percentage of the violator's stock accepted for purchase and dilute that of other tendering stockholders. We cannot accept Merrill Lynch's statements that "by virtue of a 'hedged tender,' Bobker would have realized more than his *pro rata* share on the tender ...," and that "although Bobker would have been 'net long' only 2,000 shares on the proration date, he would ac-

count for 6,000 shares having been tendered".

It is true that Bobker, by placing with Merrill Lynch an order to sell short 2,000 Phillips shares at $48.50, believed that following the proration date the market price of the stock would drop, which it did, probably because the shares accepted by Phillips amounted to only 54% of those outstanding. His short sale, however, amounted to a separate gamble, inherent in every short sale, which would have been financed by Bobker's deposit with Merrill Lynch of sufficient funds to protect it if the market price of Phillips stock, instead of falling, should rise. In the latter event, Bobker would have lost money on the short sale. Unless all short sales during the course of a tender offer are to be outlawed, the short sale of 2,000 shares in the present context would not appear to be contrary to the purpose of § 10(b) or Rule 10b–4. It represented a separate transaction. Merrill Lynch has not advanced any explanation of how the transaction would increase Bobker's *pro rata* share on his tender of 4,000 shares or dilute the *pro rata* share of other tendering Phillips stockholders.

■ There remains, however, the fact that, despite the foregoing, Rule 10b–4 provides that a person is deemed to own a security only to the extent that he has a "net long" position in it. Bobker's "net long" position in Phillips shares on the proration date would have been only 2,000 shares if his short-sale order had not been cancelled by Merrill Lynch. Nevertheless he planned to adhere to his 4,000–share tender if the short sale had been executed. At first blush this "net long" provision of the Rule, upon which the district court relied, would seem to support its holding that the arbitrators, who were aware of it, had been guilty of "manifest disregard of

the tender 2,000 of the 4,000 shares that he previously tendered or cover his short sale by purchasing 2,000 additional shares in the open market. If Bobker took either of these steps prior to the proration date he would satisfy the "net long" provision of Rule 10b–4. On March 13, 1985, Merrill Lynch therefore advised Bobker that it had cancelled the short sale because it

had "a policy that we [Merrill Lynch] cannot sell Phillips Petroleum short". That "policy" could have been based on reasons unrelated to Rule 10b–4, such as Merrill Lynch's desire either itself to tender the 2,000 shares rather than loan them to Bobker to effectuate his short sale or itself to trade the shares in the market.

the law" in making their award. Indeed, in support of his decision, Judge Weinfeld noted a line of decisions to the effect that an administrative agency's long-standing interpretation of the statute and regulations under which it operates is entitled to considerable deference. However, an examination of those decisions reveals that the agency's interpretation and regulations have been upheld only when they are consistent with the purpose and legislative history of the statute administered by it and have a rational basis. *See, e.g., Hayfield Northern Railroad Co., Inc. v. Chicago and North Western Transportation Co.,* 467 U.S. 622, 634, 104 S.Ct. 2610, 2618, 81 L.Ed.2d 527 (1984) (ICC's interpretation of its regulatory authority under federal railroad abandonment statute, consistent with the statute's failure to refer to continued federal control over abandoned property, upheld); *Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 41–42, 70 L.Ed.2d 23 (1981) (Although interpretation of statute by agency administering it is entitled to deference, the courts "must reject administrative constructions of the statute, whether reached by adjudication or by rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement."); *E.I. du Pont de Nemours & Co. v. Collins,* 432 U.S. 46, 54–55, 97 S.Ct. 2229, 2234–35, 53 L.Ed.2d 100 (1977) (SEC's construction of § 17 of Investment Company Act upheld as consistent with language and legislative intent); *United States v. National Assn. of Securities Dealers, Inc.,* 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975) (longstanding SEC interpretation of § 22(d) of Investment Company Act, which is consistent with its language and legislative history, "while not controlling, is entitled to considerable weight"). As the Supreme Court stated in *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979):

> "But this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history. On a number of occasions in recent years this Court has found it necessary to reject the SEC's interpretation of various provisions of the Securities Acts. See *SEC v. Sloan,* 436 U.S. 103, 117–119 [98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148] (1978); *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 41 n. 27 [97 S.Ct. 926, 949 n. 27, 51 L.Ed.2d 124] (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 212–214 [96 S.Ct. 1375, 1390–1391, 47 L.Ed.2d 668] (1976); [*United Housing Foundation, Inc. v.*] *Forman,* 421 U.S. [837], at 858 n. 25 [95 S.Ct. 2051, at 2063 n. 25, 44 L.Ed.2d 621 (1975)]; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 759 n. 4 [95 S.Ct. 1917, 1936 n. 4, 44 L.Ed.2d 539] (1975) (Powell, J., concurring); *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 425–427 [92 S.Ct. 596, 600–602, 30 L.Ed.2d 575] (1972)."

When the SEC exceeds its authority in the adoption of a rule or otherwise misinterprets a statute administered by it, courts have not hesitated to question the Commission's power to promulgate the rule, *United States v. Guterma,* 281 F.2d 742, 748–49 (2d Cir.), *cert. denied,* 364 U.S. 871, 81 S.Ct. 114, 5 L.Ed.2d 93 (1960); *Greene v. Dietz,* 247 F.2d 689, 692–93 (2d Cir.1957), or even to declare the rule invalid, *Perlman v. Timberlake,* 172 F.Supp. 246, 258 (S.D.N.Y. 1959).

In the present case we need not decide whether the SEC's Rule 10b–4, insofar as it imposes a "net long" requirement as a condition of ownership, is invalid because it has no rational basis as a means of implementing the purpose of § 10(b), which is to outlaw deceptive or manipulative practices. The sole issue before us is whether the arbitrators, in not strictly enforcing the "net long" provision, acted in "manifest disregard of the law". We cannot agree that they did. On the contrary, their long colloquy with counsel, after being informed of the provisions of Rule 10b–4, reveals that as a result of careful and conscientious analysis they had serious doubts

about the rationality and interpretation of the "net long" proviso and how it serves the Rule's avowed purpose of preventing a stockholder such as Bobker from increasing his *pro rata* share of stock tendered and accepted over the *pro rata* share of that tendered by other stockholders.

Nor can we agree with the district court's conclusion that the arbitrators' alleged disregard of the law is underscored by their "arbitrarily" splitting the $23,000 lost profits claimed by Bobker and awarding him half of that amount plus costs and expenses. Since Merrill Lynch cancelled Bobker's 2,000–share short sale, it was impossible to determine the precise date and lower market price at which Bobker would have purchased 2,000 shares to cover his short sale. An estimate was therefore necessary. Moreover, the arbitrators were not required to explain their computation. *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214 (2d Cir.1972).

Accordingly we hold that the arbitrators did not act in manifest disregard of the law. We reverse the order of the district court and remand the case with directions to dismiss the complaint.

MESKILL, Circuit Judge, concurring:

I agree with the majority's conclusion that the arbitrators did not act in manifest disregard of the law. This conclusion can be reached, however, without extensively analyzing the arbitrators' decision and without comment on the propriety of the net long proviso of Rule 10b–4. In fact, one need look no further than the transcript of proceedings in this case to reach a proper result.

Even a cursory review of the record reveals that the arbitration panel engaged in a considered and detailed analysis of Rule 10b–4's application to this case. As the majority points out, a separate arbitration session, comprising twenty pages of the record, was devoted exclusively to the proper interpretation of the Rule. In it, concern and confusion was expressed over the reach and meaning of a complicated

rule and its application to an equally complex factual scenario.

The statements of Mr. Sullivan, chairman of the arbitration panel, reflect clearly that the focus of concern was upon the disposition of the case under Rule 10b–4:

> Then it comes down to what you both said initially and what you said at the first meeting, Pat, that it is a matter of interpretation of the law, and you presented the law, Ms. Cotter, and you presented the law, Mr. Goldstein, and we now hopefully have to come up with the right answer on this law, and it is a very gray area. I think this is just going to be a deliberation we are going to have to go through.

J.App. at 233. Given this express statement of concern, it is apparent that the district court's conclusion that the arbitrators ignored the applicable law is entirely without foundation.

In reviewing arbitrators' decisions, manifest disregard of the law may be found only where the arbitrators " 'understood and correctly stated the law but proceeded to ignore it.' " *Siegal v. Titan Industrial Corp.*, 779 F.2d 891, 893 (2d Cir.1985) (quoting *Bell Aerospace v. Local 516*, 356 F.Supp. 354, 356 (W.D.N.Y.1973), *rev'd on other grounds*, 500 F.2d 921 (2d Cir.1974). No evidence was presented here that the arbitrators ignored Rule 10b–4. As noted, all of the evidence is to the contrary.

The district court, however, held that the arbitrators must have ignored the Rule because their discussion was contrary to a clearly dictated legal result. J.App. at 308–09. The majority reverses the district court's holding by demonstrating that the arbitrators' decision was correct. This proves too much. Rule 10b–4 is a complex regulation which is subject to a number of different interpretations. Again, the statements of Mr. Sullivan attest to the difficulty encountered in administering the Rule: "I read that law and I cannot interpret it, and neither you nor Mr. Goldstein will admit this, either one of you can take the other side of this case, and argue it beauti-

**938**

fully, because it is so indeterminate, in my view." J.App. at 223. The district court, in fact, far from expressing certainty in the Rule's application, requested additional briefing on the issue from the SEC. Moreover, a separate arbitration session was required for the sole purpose of deciphering the regulation. Even after this session, with supplemental legal memoranda presented, the law remained "indeterminate" to the arbitration panel. Based on this record, the district court could not have found that the legal result was clear but was ignored by the arbitrators. Our analysis should end here.

Whether the majority disagrees with Judge Weinfeld's decision on the merits is entirely beside the point. The standard of manifest disregard was adopted to insulate arbitration decisions from precisely this kind of inquiry. *See Wilko v. Swan,* 346 U.S. 427, 436–37, 74 S.Ct. 182, 187–88, 98 L.Ed. 168 (1953). The majority opinion in this case perpetuates the district court's error by reversing the district court on the merits of the arbitrators' decision and by engaging in unnecessary speculation over the validity of Rule 10b–4. We need not express any view on the correctness of the arbitrators' or district court's decision. All that is needed here is a recognition of the arbitrators' efforts to apply an unclear rule of law to a complex factual situation. When the appropriate legal principles are applied, it is clear that the arbitration panel did not act in manifest disregard of the law.