**PROVIDENCE AND WORCHESTER
RAILROAD COMPANY
Plaintiff,**

v.

**NATIONAL RAILROAD PASSENGER
CORPORATION Defendant.**

**No. 3:02–CV–1392 GLG.**

United States District Court,
D. Connecticut.

Dec. 16, 2002.

Howard E. Walker, Hinckley, Allen & Snyder, Providence, RI, David A. Leff, Levy, Leff & Toole, New Haven, CT, for Plaintiff.

US Court of Appeals, Office of the Clerk, New York City, Notice Only.

Michael R. Stern, New Haven, CT, George W. Mayo, Jr., Hogan & Hartson, Washington, DC, for Defendant.

### *MEMORANDUM DECISION*

GOETTEL, District Judge.

The petitioner, Providence and Worchester Railroad Company (P & W), appeals from an arbitrator's ruling requiring it to pay an increased rate of compensation for track usage and associated costs, as well as other costs, to the respondent, National Railroad Passenger Corporation (Amtrak). P & W seeks vacatur of the arbitrator's judgment **[Doc.# 4]** based on its claim that the arbitrator manifestly disregarded the law because he improperly (1) acted in contravention of the parties' contractual agreements and (2) determined and included costs in the new compensation rate. Conversely, Amtrak argues that the arbitrator's judgment was proper and seeks to have it confirmed **[Doc.# 6]**. We confirm the arbitrator's judgment.

### BACKGROUND

The Northeast Corridor (NEC) is a set of railroad tracks extending from Wash-

ington, D.C. to Boston, Massachusetts. It has been in existence since the early 1800's. P & W has been operating freight trains over the NEC since the 1840's. In 1970, the owner of the NEC, Penn Central Transportation Company (Penn Central), filed for bankruptcy, and the NEC fell into a severe state of disrepair. In 1976, Penn Central conveyed the NEC to Consolidated Rail Corporation (Conrail), which immediately conveyed most of it to Amtrak. Since then, Amtrak, with congressional funding, has devoted hundreds of millions of dollars to the maintenance and upgrade of the NEC; that continues to this day.

To develop the NEC so that it could operate from Washington, D.C. to Boston, Massachusetts, Amtrak entered into an agreement with P & W whereby P & W conveyed certain property to Amtrak in exchange for operating rights over portions of the NEC, as well as several parcels of real property.[1] This was memorialized in 1978, which was the first of several agreements between Amtrak and P & W.[2]

In 1979, the parties entered into an agreement that established the compensation rate that P & W was to pay Amtrak for its track usage at $.267829 per freight car or locomotive unit mile.[3] The rate

included the "use, operation of and maintenance of Northeast Corridor properties and for services provided by Amtrak in connection with the operation of P & W's freight trains." Pet.'s App. to Vacate, Ex. B at 2. The contract provided further that the established compensation rate would be adjusted quarterly according to the Association of American Railroads Quarterly Index of Charge-out Prices and Wage Rates. From 1978 to 1982, P & W's compensation rate increased only slightly.

Because of a lengthy and contentious legal battle before the Interstate Commerce Commission (ICC)[4] between Amtrak and Conrail, which addressed the costing methodology[5] used to set Conrail's compensation rate for its NEC usage, Amtrak and P & W agreed to set P & W's compensation rate equal to the rate that Conrail and Amtrak agreed to in 1976. Amtrak made this agreement with P & W knowing that a judgment in the Conrail litigation would necessarily affect how compensation rates are determined between Amtrak and other railroad companies.

In fact, the ICC agreed with Conrail's position and determined that compensation

---

1. Also, as part of its 1978 agreement with Amtrak, P & W retained a perpetual easement to conduct railroad operations over all portions of railroad that it conveyed to Amtrak.

2. Amtrak and P & W entered into contracts in 1978, 1979, 1982, 1983 and 1988. The details of those agreements will be set forth as necessary. The contracts will be referred to collectively as the "several contracts," unless specified otherwise.

3. A car mile or locomotive unit mile refers the distance that each railroad car travels on the railroad tracks.

4. The ICC is now the Surface Transportation Board.

5. There are three basic costing methodologies involved in this case. The "common benefit"

costing method "is a proportionate sharing of all costs of providing transportation over the NEC incurred for the common benefit of Amtrak and P & W;" "sole benefit" costs are those costs that Amtrak incurs, not for its benefit, but for the sole benefit of P & W; "avoidable costs" are those costs that Amtrak would save or avoid if P & W did not use the NEC. Pet.'s Mot. to Vacate, Ex. A at 5.

In the compensation dispute between Amtrak and Conrail, Conrail argued that it was responsible to reimburse Amtrak for avoidable costs only. Res. Reb. Br. Doc.# 11, at 12, 13. Amtrak, on the other hand, argued that Conrail should pay its proportionate share of common benefit costs and sole benefit costs. *Id.*

rates should be computed using an avoidable costs methodology and that Amtrak's common and sole benefit costs methodology was not appropriate. *See Nat'l Rail Passenger Corp. Application Under Section 402(a) Of The Rail Passenger Serv. Act,* 1 I.C.C.2d 243, (Oct. 25, 1984) (citing *Costing Methodologies–NE. Corridor: Commuter Serv.,* 367 I.C.C. 192 (1983)). Consequently, in a 1983 letter agreement, Amtrak and P & W agreed to lock in P & W's compensation rate of $.30 per car mile until January 1, 1985.

In 1985, however, Congress reversed the ICC ruling that established an avoidable costing methodology for computing compensation rates and established the standard set forth in 49 U.S.C. § 24904, which is based on a common and sole benefit costing methodology. *See infra* note 10. Thereafter, Amtrak renegotiated its rates with Conrail and other NEC users to reflect Congress's legislative enactment. Presently, all freight railroad companies, with the exception of P & W, pay Amtrak $.991 per car mile for NEC usage. Further, P & W has not had a compensation rate increase since 1982; it continues to pay $.30 per car mile.

The 1979 agreement provides that P & W's compensation rate can be opened and renegotiated at five-year intervals from the date of that agreement if the party seeking to renegotiate gives the other party proper notice. It provides further, "[i]f no agreement is reached, either party may invoke the arbitration provisions hereinafter contained."[6] Pet.'s App. to Vacate, Ex. B at 2; *see also* Ex. A at 12. In 1999, Amtrak gave P & W timely notice of its intention to renegotiate P & W's $.30 compensation rate. Amtrak also sought other costs from P & W. When negotiations broke down, Amtrak initiated arbitration. The arbitrator ruled in Amtrak's favor and awarded it a new compensation rate of $.991 per car mile in addition to other costs separate from the car mile rate that Amtrak incurred. This appeal followed.

## DISCUSSION

■ Before setting forth the legal principles that govern our resolution of this appeal, P & W's claim that the arbitrator acted in manifest disregard of the law can be separated into essentially two categories. The first category includes claims that focus on the arbitrator's interpretation and application of various provisions of the several commercial contracts involved in this dispute. The second category involves claims that the arbitrator applied either the incorrect allocation statute or applied the correct allocation statute but did so improperly. We will address each category of claims separately.

We set forth now the legal principles that govern our review when a petitioner challenges an arbitration award under the manifest disregard doctrine. "Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Banco de Seguros Del Estado v. Mut. Marine Offices, Inc.,* 230 F.Supp.2d 427, 429 (S.D.N.Y.2002) (citing *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir.1997)). The Federal Arbitration Act sets forth explicitly the grounds upon which an arbitration award may be vacated. *See* 9 U.S.C. § 10(a). In addition, the Second Circuit recognizes the judicial doctrine that "an arbitral decision may be vacated if it is shown to be in 'manifest disregard of law.'" *Westerbeke Corp., v. Daihatsu Motor Co., Ltd.,* 304 F.3d 200, 208 (2d Cir.2002) (citation omitted). "Our standard of review under this doctrine is

---

**6.** The 1978 and 1982 agreements also contain arbitration provisions.

'severely limited.'" *Id.* (citation omitted). Though the Second Circuit has never clearly delineated the bounds of this doctrine, it has "cautioned that manifest disregard 'clearly means more than error or misunderstanding with respect to the law.'" *DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 821 (2d Cir.1997) *cert. denied,* 522 U.S. 1049, 118 S.Ct. 695, 139 L.Ed.2d 639, (1998) (citation omitted); *see also Daihatsu,* 304 F.3d at 208, 209.

> We apply a two-prong test
>
> for ascertaining whether an arbitrator has manifestly disregarded the law[, which] has both an objective and a subjective component. We first consider whether the governing law alleged to have been ignored by the arbitrator [was] well defined, explicit, and clearly applicable. We then look to the knowledge actually possessed by the arbitrator. The arbitrator must appreciate the existence of a clearly governing legal principle but decide to ignore or pay no attention to it. Both of these prongs must be met before a court may find that there has been a manifest disregard of law.

*Daihatsu,* 304 F.3d at 210 (citations omitted, quotation marks omitted). Further, "[t]he arbitrator's factual findings and contractual interpretation are not subject to judicial challenge, particularly on our limited review of whether the arbitrator manifestly disregarded the law." *Id.* at 214; *see also Yusef Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,* 126 F.3d 15, 25 (2d Cir.1997) *cert. denied,* 522 U.S. 1111, 118 S.Ct. 1042, 140 L.Ed.2d 107 (1998).

*Category 1: Contract interpretation*

Specifically, P & W claims that the arbitrator, in contravention of the terms of the several contracts, improperly (1) applied the incorrect costing methodology,[7] (2) applied the new compensation rate retroactively, (3) required it to pay siding fees and (4) made findings regarding the "Free Zone."[8]

Because these claims involve strictly the interpretation of various provisions of the several contracts, our limited review under the manifest disregard doctrine precludes our review the arbitrator's findings. *See United Paperworkers International Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 37, 38, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987); *Daihatsu,* 304 F.3d at 214; *Toys "R" Us, Inc.,* 126 F.3d at 25. In asserting such claims, P & W impermissibly attempts to reargue the merits of its contractual arguments and challenge the findings and conclusions of the arbitrator in that regard. If courts intervened on the merits of an arbitration award, the federal policy favoring arbitration would be frustrated. *See Grosso–Jacobson Prod., Inc. v. Directors Guild of Am., Inc.,* No. 89 Civ. 5400(KC), 1990 WL 26294, at *2 (S.D.N.Y. 1990) (citing *Misco,* 108 S.Ct. at 371 (citations omitted)). We examine now P & W's second category of claims.

*Category 2: Allocation Statute*

■ P & W's claim that the arbitrator applied the incorrect allocation statute to the facts of this case is without merit. Under the first prong of the manifest disregard test, we must determine if the "governing law alleged to have been ignored by the arbitrator[ ] is well defined,

---

**7.** P & W's argument here is based on contract interpretation because it claims that the several contracts required the arbitrator to apply a costing methodology based on 45 U.S.C. § 851 (1976) and corresponding ICC rulings.

**8.** The "Free Zone" or "Operating Area" are synonymous with one another. They describe an area where P & W operates its freight trains over portions of the NEC without car mile compensation to Amtrak.

explicit, and clearly applicable.... A legal principle clearly governs the resolution of an issue before the arbitrator if its applicability is obvious and capable of being readily and instantly perceived by the average person qualified to serve as arbitrator." *Daihatsu,* 304 F.3d at 209 (citations omitted).

P & W supports its argument with nothing more than two naked assertions. First, it claims that because another stat-

ute [9] was in effect when P & W and Amtrak entered into the several contracts, it should govern this case. Second, it claims that in creating 49 U.S.C. § 24904, Congress had no authority to displace their contracts with Amtrak. Consequently, P & W has failed to carry its burden by showing that there exists any "defined, explicit, and clearly applicable" governing law other than the law the arbitrator applied to the facts of this case.[10]

**9.** 45 U.S.C. § 851 (1976) set forth the statutory basis upon which Amtrak could receive reimbursement for expenses it incurred that resulted from operations of other users of the NEC. It provided in relevant part: "(a) [Amtrak] is authorized to ... (5) enter into agreements with other railroads, other carriers, and commuter agencies, for the purpose of granting, acquiring, or entering into trackage rights, contract services, and other appropriate arrangements for freight and commuter services over the rights-of-way acquired under this subchapter, with such agreement to be on such terms and conditions as are *necessary to reimbursement for costs on an equitable and fair basis,* except that cross subsidization among intercity, commuter, or rail freight services is prohibited...." (emphasis added).

This statute, on its own, fails to provide any guidance whatsoever as to the costing methodologies to be used in determining "reimbursement for costs on an equitable and fair basis." The ICC has interpreted it as requiring compensation rates for rail freight transportation over the NEC to be based on an avoidable costing methodology. *See Costing Methodologies–NE. Corridor: Commuter Serv.,* 367 I.C.C. 192 (1983). Because Congress expressly changed the law regarding the determination of compensation rates when it enacted 49 U.S.C. 24904, compensation rates are no longer based on an avoidable costing methodology. *See infra* note 10.

**10.** The arbitrator correctly applied the following statutes to the facts of this case: 49 C.F.R. 24904(c)(1) and (2), 49 C.F.R. pt. 1201, and 49 C.F.R. §§ 1242.00, 1242.01 and 1242.02, respectively. Section 24904(c)(1) and (2) provide: Compensation for transportation over certain rights of way and facilities.—(1) An agreement under subsection (a)(6) of this section shall provide for reasonable reimbursement of costs but may not cross-subsidize

intercity rail passenger, commuter rail passenger, and rail freight transportation.

(2) If the parties do not agree, the Interstate Commerce Commission shall order that the transportation continue over facilities acquired under the Regional Rail Reorganization Act of 1973 (45 U.S.C. 701 et seq.) and the Railroad Revitalization and Regulatory Reform Act of 1976 (45 U.S.C. 801 et seq.) and shall determine compensation (without allowing cross-subsidization between intercity rail passenger and rail freight transportation) for the transportation not later than 120 days after the dispute is submitted. The Commission shall assign to a rail freight carrier obtaining transportation under this subsection the *costs Amtrak incurs only for the benefit of the carrier, plus a proportionate share of all other costs of providing transportation under this paragraph incurred for the common benefit of Amtrak and the carrier.* The proportionate share shall be based on relative measures of volume of car operations, tonnage, or other factors that reasonably reflect the relative use of rail property covered by this subsection. (emphasis added).

49 C.F.R. pt. 1201 sets forth the Uniform Systems of Accounts, Railroad Companies.

Section 1242.00 provides: (a) Commencing with annual reports for the year 1978 or for any portion thereof until further order, all class I railroad companies including class I switching and terminal companies (§ 1240.1 of this chapter) subject to section 20 of the Interstate Commerce Act as amended shall separate operating expenses common to both freight service and passenger service in accordance with the regulation in this part.

(b) The carrier shall maintain records supporting its common operating expense apportionments to freight and passenger services.

P & W's next challenge addresses the arbitrator's application of the allocation statute. Though P & W concedes that 49 C.F.R. § 24904(c) is the proper allocation statute to be applied in this case, it argues that because the arbitrator applied the proper law, he "appreciated the existence of a clearly governing legal principle" but, nevertheless, failed to apply it properly under the second prong and subjective component of the manifest disregard test. Specifically, P & W claims that the arbitrator acted in manifest disregard of the law by requiring it to pay Amtrak a compensation rate of $.991 per car mile, which is tantamount to P & W subsidizing Amtrak's operations in direct contravention of the allocation statute, because it includes costs for track maintenance, signal and communications, Federal Employer's Liability Act (FELA), as well as supervision, support, general and administrative and police patrols. By including such costs, P & W asserts that the arbitrator "appreciated the existence of a clearly governing legal principle but decided to ignore or pay no attention to it." *Merrill Lynch, Pierce & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir.1986).

Assuming the first prong to be satisfied here, P & W still cannot prevail because "it is not enough that the moving party provide proof that the arbitrator was aware of the governing legal principle; there must also be a showing of intent to disregard the governing law.... A court may find intentional disregard if the reasoning supporting the arbitrator's judgment 'strains credulity', or does not rise to the standard of 'barely colorable.'" *Daihatsu*, 304 F.3d at 217, 218 (citations omitted); *see also DiRussa*, 121 F.3d at 821, 822.

### Track maintenance

Because Amtrak maintains its track to a level of standard that exceeds the level at which P & W would maintain its own track in Amtrak's absence, P & W argues that the compensation rate should be adjusted downward to reflect the level of standard to which it would maintain its own tracks. No such downward adjustment for differing maintenance requirements related to the level of track standard is called for in the allocation statute. It requires merely that common benefit costs be allocated proportionately. *See* 49 U.S.C. 24904(c)(2) (1997).

### Signal Costs

P & W claims "the vast majority of the signal and communication maintenance costs Amtrak incurs do not benefit P & W's freight operations in any meaningful way for the purpose of assessing a car mile rate." Pet.'s App. to Vacate at 13. Here, P & W's argument is similar to its argument regarding track standards. P & W posits that it needs only a primitive signaling and communication system for use of its trains and because Amtrak's system is far more sophisticated does not entitle Amtrak to costs that P & W would not have to spend in Amtrak's absence. Again, the allocation statute provides for no such method of downward adjustment based on the sophistication of signal and communication systems. *See Id.* Further,

The carrier shall report common expense apportionments to the Board as required.

Section 1242.01 provides: "The Uniform System of Accounts for Railroad Companies (49 CFR 1201) requires that carriers assign directly to freight service or to passenger service, including allied services, the expenses, taxes, and purchased services incurred solely for the benefit of either freight or passenger service."

Section 1242.02 provides: "The Uniform System of Accounts also requires that carriers assign to common expense accounts the remaining expenses, taxes and purchased services which are not solely related to either freight or passenger service...."

we have no doubt that P & W benefits from Amtrak's signal and communication system. Therefore, the arbitrator properly included such costs in the new compensation rate.

*Supervision, Support, and General and Administrative Costs*

Finally, the arbitrator's award properly including in the new compensation rate P & W's proportionate share of FELA, police patrol, administrative, supervisory, support, general and administrative costs. P & W gains at least some benefit from the costs Amtrak incurs under each of those categories. As a result, P & W must pay its proportionate share of those benefits because the governing statute does not exempt it from paying any of those costs.

The arbitrator's judgment cannot be said to "strain credulity" or fail to rise to the standard of "barely colorable." To the contrary, the arbitrator recognized the governing law and applied appropriately.

*Conclusion*

P & W has failed, in all instances, to show that the arbitrator acted in manifest disregard of the law. The arbitrator's findings and conclusions, therefore, are confirmed. Consequently, P & W's application to vacate the arbitration award [**Doc.# 4**] is **DENIED**, and Amtrak's counter application to confirm the arbitration award [**Doc.# 6**] is **GRANTED**. The clerk is directed to enter judgment accordingly.

**SO ORDERED.**