**CLARENDON NATIONAL INSURANCE COMPANY, Petitioner,**

**v.**

**TIG REINSURANCE COMPANY, f/k/a Transamerica Reinsurance Company, and TIG Insurance Company, Respondents.**

**No. 97 Civ. 5911(RWS).**

United States District Court,
S.D. New York.

Jan. 12, 1998.

Marks & Murase, New York City, Gary A. Adler, Diane C. Hertz, of counsel, Foley & Lardner, Milwaukee, WI, Robert A. DuPuy, of counsel, for Petitioner.

Chadbourne & Parke, New York City, Peter R. Chaffetz, Steven C. Schwartz, of counsel, for Respondents.

## OPINION

SWEET, District Judge.

Petitioner Clarendon National Insurance Company ("Clarendon") has moved to vacate the arbitration award issued in the arbitration proceeding between Clarendon and TIG Reinsurance Company ("TIG"). TIG has cross-moved to confirm the award in part and to remand one issue for further determination by the arbitrators. For the reasons set forth below, the cross-motion of TIG is granted, the award is confirmed as to certain issues and one issue is remanded to the arbitrators.

### Prior Proceedings

TIG, a Stamford, Connecticut based reinsurance company, began operations in 1987 to accept a spin-off of a segment of the reinsurance business then operated by Clarendon. Clarendon is a New York-based company that specializes in a type of reinsurance known as "financial" or "finite risk" reinsurance, a form of reinsurance in which the reinsurer's risk is more limited than in traditional reinsurance. Prior to 1987, Clarendon also wrote some traditional reinsurance business. Under the 1987 transaction, TIG accepted Clarendon's traditional, or non-financial, reinsurance business, and Clarendon retained its financial and finite risk reinsurance business. The parties accomplished this transaction through several inter-related contracts, including a Portfolio Reinsurance Agreement ("Portfolio Agreement") and a Management Agreement.

In the transaction, TIG acquired 300 separate reinsurance treaties, the people it wanted to run the business, the ability to manage Clarendon's business going forward, and $73.9 million in cash from Clarendon. As part of the transaction, TIG agreed to pay the first $99.8 million in losses on Clarendon's behalf. TIG was protected because Clarendon would pay any losses over that amount. In the event the losses were less than $99.8 million or in the event that the time and distance risk proved favorable to TIG, the contracts asymmetrically allowed TIG to keep the upside.

In exchange, Clarendon received balance sheet assistance by being able to relieve itself of $99.8 million in liabilities. Also, to protect Clarendon with regard to the management of its business, TIG agreed not to modify or amend the subject business without the express written permission of Clarendon.

The Portfolio Agreement transferred to TIG the liability for losses under specified reinsurance contracts originally issued to various insurance companies by Clarendon. That agreement defined how the premiums and losses on those contracts would be divided between the two companies. The Management Agreement authorized TIG to administer the contracts transferred.

Disputes over allocation of premiums and losses under the Portfolio Agreement and other issues led the parties to claim tens of millions of dollars from each other.

The parties first commenced arbitration proceedings in 1992. Preparation for that arbitration followed discovery, including the exchange of documents and nearly twenty depositions. The parties settled most, but

not all of the issues and documented that partial settlement through an agreement of November 17, 1994, entitled "Memorandum of Understanding." ("MOU").

The matters that were not released were discussed in § 1.3 of the MOU Section 1.3 reads, in pertinent part:

A. *ARBITRATION OF CERTAIN MATTERS*. Notwithstanding Paragraphs 1.1 and 1.2 [the releases], the parties agree that the following matters shall be subject to arbitration in accordance with Article 7 hereof if the parties are unable to resolve their differences within one hundred twenty (120) days from the date hereof:

(1) The amount of compensation, if any, whether characterized as additional premium or otherwise, owed CLARENDON by TIG arising from the amendments of treaties C1001, C1001–2, and C1001–3, between CLARENDON and Frontier Insurance Company in early 1988.

(2) The correct accounting treatment under the Transaction Documents of the payments made by TIG to Frontier with respect to the commutation/termination of treaties C1001, C1001–2, and C1001–3, between CLARENDON and Frontier Insurance company. The payment amount and date of commutation/termination for the three treaties is as follows: ...

(3) The correct accounting treatment under the Transaction Documents of: (a) contingent commissions received by CLARENDON in connection with the Frank B. Hall program; and (b) contingent commissions received by TIG RE on the Subject Business....

C. *INTEREST*. Any payments due the other party under Paragraph 1.3.A. shall be payable with interest within thirty (30) days of an award of an arbitration panel under article 7 hereof. Interest shall be calculated at the rate of ten percent (10%), compounded quarterly, from the date of entitlement s per the Transaction Documents to the date of payment.

MOU, § 1.3 The parties also agreed that disputes as to the payments to be made under § 1.3.A. would be arbitrated pursuant to Article 7 of the MOU. Article 7 reads, in pertinent part:

The parties agree to use the existing arbitration panel to resolve any disputes hereunder, including the matters to be arbitrated under paragraph 1.3.A., assuming the arbitrators are ready, willing and able to serve.... Notwithstanding the foregoing, all matters relating to arbitration shall be governed by the Federal Arbitration Act.

MOU, Art. 7.

After the execution of the MOU, the parties submitted the claims to a new panel of arbitrators subject to the limitations contained in the MOU and, subsequently, by a stipulation between the parties and the arbitrators at the preliminary organizational hearing.

In 1995 the parties abandoned their negotiations and submitted three remaining issues to arbitration. The actual arbitration hearing began on January 29, 1997. Near the conclusion of the hearing, the parties and the arbitrators had a discussion regarding the procedure for completing the arbitration. It was determined that the arbitrators would rule upon the issue of liability first and then, depending upon the outcome, determine the issue of damages, if the parties were unable to settle within a prescribed time period.

Post-hearing briefs were submitted to the panel. After the final briefing by the parties on March 10, 1997, the panel issued the award on the issue of the parties' respective liability (the "Liability Award"). The Liability Award reads in pertinent part:

1. The termination by Frontier ... of the medical malpractice treaties with Clarendon resulted in a return of premium to Frontier. Clarendon is responsible to reimburse TIG Re accordingly....

2. TIG Re breached the Management Agreement between Clarendon and TIG Re by amending the Frontier treaties retroactively to expand the treaties and lower the attachment point without Clarendon's written approval....

3. Clarendon is entitled to significant compensation as a result of the exposure resulting from such breach....

4. Contingent commissions receivable shall not offset contingent commissions payable or other items payable as losses under the ultimate net aggregate loss cause of the Portfolio Reinsurance Agreement between Clarendon and TIG Re....

5. Notwithstanding point 4 above, receivables under other loss sensitive rating plans (*e.g.,* sliding scale premium adjustments and retrospective premium adjustments) shall offset payables under the ultimate net aggregate loss clause in such Portfolio Reinsurance Agreement....

The Liability Award also ordered the parties to negotiate the monetary application of the liability findings. If the negotiations were not successful within thirty days, the panel ordered that it would "make such an application under such conditions and within such time period as the Arbitration Panel may determine."

After Clarendon received the Liability Award, and after settlement negotiations between the parties failed, Clarendon raised the issue of a damages argument with the panel. The chairman, however, refused to have a hearing on damages claiming that the panel had all of the evidence on that issue that it required.

Subsequently, the panel issued its award dated May 13, 1997 (the "Damage Award"). The Damage Award reads in pertinent part:

1. With respect to the funds paid to Frontier Insurance Company ("Frontier") as a result of the termination of the treaties between Frontier and Clarendon, Clarendon shall pay TIG Re $4,836,000 plus the interest agreed by the parties to be applicable in awards issued pursuant to this arbitration. ....

2. With respect to the breach of the Management Agreement in regard to amending the Frontier treaties retroactively to extend the treaties and lower the attachment point, TIG Re shall pay Clarendon $2,335,520, inclusive of interest (i.e., in lieu of the interest agreed by the parties to be applicable to awards issued pursuant to this arbitration). ....

3. With respect to points 4 and 5 of the Panel's March 10, 1997 ruling on liability [the Liability Award] with respect to contingent commissions and loss sensitive rating plans, it is not evidence to the Panel that a further ruling by the Panel is necessary for the parties to calculate damages. ....

After its receipt of the Damage Award, TIG requested that the Panel modify its award. Clarendon submitted a response to TIG's request and also asked the Panel to clarify its earlier awards. After brief consideration of the parties' submissions, the Panel ruled as follows:

Gentlemen:

The deliberations of the Panel are closed. The Panel will make no further findings and will issue no orders related to its findings other than those already communicated to the parties. In light of the various questions raised by the parties, the Panel makes the following observations which may assist the parties in bringing this matter to a conclusion:

1. The parties retain whatever right to inspect records as may be contained in relevant documents such as the management contract, which survived this arbitration.

2. The memorandum of understanding and its meaning were not placed before the arbitration panel and the Panel's findings were not intended to alter the terms of this document. Should the parties have a dispute concerning this document, they should pursue such a dispute in a separate form.

3. A literal reading of paragraphs 4 and 5 of the Panel's Finding on Liability demonstrates that they relate to different and discrete contractual provisions.

Paragraph 4 obligates TIG Re to pay contingent commissions to Clarendon. Paragraph 5 obligates Clarendon to pay or credit TIG with receivables on other loss-sensitive plans....

The petition to vacate the award was filed by Clarendon on August 8, 1997, TIG filed its cross-motion to confirm and remand. The motion and cross-motion were heard on October 8, 1997 and considered fully submitted at that time.

## The Issues

### Issue I—The Frontier Termination Payment

The first issue addressed by the Panel was a claim by TIG for partial reimbursement of its $15 million payment to a customer upon the termination of one of the reinsurance contracts transferred under the Portfolio Agreement. That contract reinsured certain medical malpractice policies issued by Frontier Insurance Company and was known as "the Frontier Treaty."

TIG contended that a strict reading of the Portfolio agreement made Clarendon responsible for nearly $10 million of the $15 million Frontier termination payment and also proposed an equitable compromise under which Clarendon would reimburse TIG for roughly $4.8 million of the payment. Clarendon insisted that it had no responsibility at all for the payment to Frontier.

The Panel in its Findings on Liability determined that TIG's payment to Frontier was a "return premium," and that Clarendon was required to reimburse TIG "accordingly." and in its Findings on Damages awarded TIG $4,836,000 plus interest.

### Issue II—Clarendon's Breach of Contract Claim

Prior to the termination of the Frontier treaty, TIG had agreed to a modification of that contract without obtaining Clarendon's written approval as required by the parties' Management Agreement. Clarendon contended that that change in the treaty was in breach of the Management Agreement and had created additional reinsurance exposure for which Clarendon should be compensated.

TIG contended that it had obtained oral approval for the change and denied that the amendment had materially affected Clarendon's exposure. In its Findings on Liability, the Panel accepted Clarendon's argument that TIG had breached the Management Agreement by amending the Frontier Treaty without Clarendon's written consent, and ruled that Clarendon was entitled to "significant compensation." In its Finding on Damages, the Panel awarded Clarendon $2,335,-520, including interest.

### Issue III—Contingent Commissions

The third issue arose out of TIG's and Clarendon's competing claims to "contingent commissions" received under some of the reinsurance contracts transferred under the Portfolio Agreement. These amounts were paid by companies reinsured and varied based upon the level of reinsured losses. Following the spin-off of TIG, TIG and Clarendon each received a portion of such payments. However, each company claimed that the Portfolio Agreement gave it the right to 100% of the payments in this category and therefore sought to recover those contingent commissions that had been received by the other. The MOU provided that Clarendon's maximum recovery on its "contingent commission" claim would be $1.189 million and that TIG's maximum recovery would be $1.596.

In its Findings on Liability, the Panel accepted Clarendon's argument that TIG had breached the Management Agreement by amending the Frontier Treaty without Clarendon's written consent, and ruled that Clarendon was entitled to "significant compensation." In its Findings on Damages, the Panel awarded Clarendon $2,335,520, including interest.

### Discussion

The Federal Arbitration Act ("FAA") provides that a court "must grant . . . an order [confirming an arbitration award] unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9. *See Ottley v. Schwartzberg,* 819 F.2d 373, 375 (2d Cir.1987).

The grounds for vacating awards are narrow. Indeed, courts have consistently held that " 'arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.' " *Dirussa v. Dean Witter Reynolds, Inc.,* 121 F.3d 818, 821 (2d Cir.1997) (citation omitted). Moreover, the burden is on the party seeking to vacate the award to establish one of the statutory grounds for that relief. *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.,* 103 F.3d 9, 12 (2d Cir.1997).

Thus, the Second Circuit "adhere[s] firmly to the proposition[ ] ... that an arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is a '*barely colorable justification* for the outcome reached.'" *Landy Michaels Realty Corp. v. Local 32B–32J,* 954 F.2d 794, 797 (2d Cir.1992) (emphasis added; citation omitted). If such a "barely colorable justification" exists, the award must be confirmed "even if the ground for [the] decision is based on an error of fact or an error of law." *Willemijn Houdstermaatschappij,* 103 F.3d at 13.

As set forth below, the arbitration award in the instant case will be remanded in part and confirmed in part. It appears to be permissible for a district court affirm an arbitration award in part where the section affirmed represents a separate and independent claim, and the claim is finally and definitely resolved.

██ It is well-settled that an arbitration award disposing of a separate and independent claim may be deemed final and subject to confirmation although it does not dispose of all the claims that were submitted to arbitration. *Metallgesellschaft A.G. v. M/V Capitan Constante,* 790 F.2d 280, 283 (2d Cir. 1986) (award which finally and definitely disposes of separate independent claim may be confirmed although it does not dispose of all claims submitted to arbitration); *Sperry International Trade, Inc. v. Government of Israel,* 532 F.Supp. 901, 906 (S.D.N.Y.) *aff'd on other grounds,* 689 F.2d 301 (2d Cir.1982) ("Disposition of an issue that is severable from other issues still before the arbitrators may be deemed final and subject to confirmation."); *In the Matter of the Arbitration Between Puerto Rico Maritime Shipping Authority v. Star Lines, Ltd.,* 454 F.Supp. 368, 372 (S.D.N.Y.1978) (where arbitration award is valid in part and invalid in part, and valid portion concerns claims separable from and non-dependent on claims covered by invalid portion, "the valid portion of the award is confirmable notwithstanding the absence of an award that finally disposes of all the claims that were submitted to arbitration.")

In *Seton Co. v. Lohmann GmbH & Co., KG,* No. 90 Civ. 1312(CSH), 1992 WL 80637 (S.D.N.Y. April 9, 1992) (Haight, J), the court was faced with an arbitration award which required clarification on one particular portion. The plaintiff contended that the award was severable and should be confirmed in part, and remanded in part. The defendant countered that an arbitrator's award must be confirmed or remanded in its entirety, whether or not the claims were separate and independent. *Id.* at *7. The court noted that confirmation of a partial arbitration award had been approved by the case law, and that the availability of partial confirmation "reflects the frequently expressed purpose of arbitration to permit a relatively quick and an inexpensive resolution of contractual disputes." *Id.* at *8 (quoting *Diapulse Corp. v. Carba Ltd.,* 626 F.2d 1108, 1110 (2d Cir. 1980)). The court further noted that district courts have discretion under Rule 54(b) to enter final judgment "as to one or more but fewer than all of the claims" when there is no just reason for delay, and that it would be perverse to deny one subject to arbitration the same prompt relief that it would have received from a court. *Id.* (quoting *Metallgesellschaft,* 790 F.2d at 282). Finally, the court determined that the issue subject to clarification was in fact separate from and independent of those which could be confirmed, and that the confirmable awards were not subject to abatement and set-off. *Id.* at 8–9. Accordingly, the court concluded that the plaintiff was entitled to immediate confirmation of part of the arbitration award, and the remainder would be remanded for clarification. *Id.* at 9.

### *Reversal of the Entire Arbitral Award is Not Warranted on the Grounds that the Panel Refused to Hear Further Evidence on Damages*

Clarendon has challenged the entire arbitral award based upon the two-stage determination process and the Panel's refusal to hear further evidence on damages. Clarendon has asserted its understanding that the Panel would permit additional argument or discussion the issue of damages. However, the record contains no statement by the Panel to that effect. Clarendon did not ask for an additional hearing on damages at the time that all evidence had been submitted, and the Panel did not state that it would entertain

additional submissions, other than post-hearing briefs, which in Clarendon's instance addressed its damage theories, without requesting any further submissions.

Clarendon did not address TIG's claim for damages before the Panel ruled on liability, apparently relying on its denial of liability for the Frontier termination payment. After the Panel rejected that position, Clarendon sought to reopen the proceedings as to TIG's damages.

■ The Panel denied this request. Courts have held that, " '[o]nly the most egregious error which adversely affects the rights of a party' constitutes misconduct and '[e]rroneous exclusion of evidence does not in itself provide a basis for vacating an award absent substantial harm to the moving party.' " *In Matter of Consolidated Arbitrations Between A.S. Seateam v. Texaco Panama, Inc.,* No. 97 Civ. 0214, 1997 WL 256949, *7 (S.D.N.Y. May 16, 1997). Further, such misconduct " 'must amount to a denial of fundamental fairness of the arbitration proceeding.' " *Areca, Inc. v. Oppenheimer & Co., Inc.,* 960 F.Supp. 52, 54–55 (S.D.N.Y.1997).

■ Here, the Panel afforded Clarendon a full opportunity to address every issue before taking the case under submission. Thus, the Panel plainly did not deprive Clarendon of a fundamentally fair hearing. *Cf. Kaplan v. Alfred Dunhill of London, Inc.,* No. 96 Civ. 0258, 1996 WL 640901 (S.D.N.Y. Nov. 4, 1996) (hearing was fundamentally unfair where one side did not appear at all).

### The Damages Award Relating to Issue I Will Be Affirmed

Clarendon challenges the amount of damages awarded as to termination of the Frontier Agreement on the grounds that the amount of damages is based on a mistaken calculation submitted to the Panel by TIG. Going into the hearing both sides had believed that TIG's payment upon termination of the Frontier Treaty was $15,299,000. However, it was discovered that the payment was over-stated by $363,000 and this correction was explained to the Panel. The Panel did not explicitly take the $363,000 correction into account in reaching its ruling, and there

is no way to discern whether it included the correction or not.

■ Section 10 of the FAA defines several narrow grounds on which a court may vacate rather than confirm an arbitration award. Accepting erroneous evidence is not one of them, even if that is what did occur. Court have confirmed arbitration awards they believed to be wrong. *See, e.g., In the Matter of the Arbitration Between Andros Compania Maritima, S.A. of Kissavos, Marc Rich & Co., A.G.,* 579 F.2d 691, 703 (2d Cir.1978) (confirming although grounds for award "do not command our heartfelt concurrence"); *I/S Stavborg v. National Metal Converters, Inc.,* 500 F.2d 424 (2d Cir.1974) (affirming award although it was based on "clearly erroneous" interpretation of the contract).

Indeed, even where arbitrators have miscalculated damages, this is not a ground for judicial alteration of the award. For example, in *B.V.D. Licensing Corp. v. Maro Hosiery Corp.,* No. 88 Civ. 2459, 1990 WL 200648 (S.D.N.Y. Dec.4, 1990), this Court confirmed an award despite an alleged miscalculation of damages, noting that such miscalculation "does not rise to the level of error which is required to vacate the award." *See also In Matter of Arbitration between Cole Publishing Co., Inc. v. John Wiley & Sons, Inc.,* No. 93 Civ. 3641, 1994 WL 532898, *2 (S.D.N.Y. Sept.29, 1994) (upholding award slightly higher than damages claimed in post-hearing memorandum, and noting that "[i]t is not for this court to reconsider" damages evidence).

*Collins & Aikman Floor Coverings Corp. v. Froehlich,* 736 F.Supp. 480 (S.D.N.Y.1990) does not support Clarendon's position. In *Collins & Aikman,* this Court vacated an arbitration award that set damages many times higher than any amount supported by the relevant evidence. By contrast, this Panel's award on Issue I, the Frontier termination payment, is less than half of what the Panel's liability ruling could have supported. In short, the Panel's ruling was well within its authority and there is no basis for vacating the award.

### Issue II is Remanded to the Arbitrators

As to Issue II, the Damage Award required TIG to pay Clarendon $2,335,520, "inclusive of interest (i.e. in lieu of the interest agreed by the parties to be applicable to awards issued pursuant to this arbitration)." The MOU expressly described how the parties would calculate interest with respect to any arbitration award. Thus the award must be remanded.

The MOU stated that "any payments due the other party ... shall be payable with interest within thirty (30) days of an award of an arbitration panel ... [and] shall be calculated at the rate of ten percent (10%), compounded quarterly, from the date of entitlement as per the transaction documents to the date of payment." MOU, § 1.3. Thus, the parties agreed that interest would be calculated based on the MOU as opposed to through the Damage Award.

 Because the arbitrators ignored the MOU and nevertheless ruled that interest would be included in the Damage Award in favor of Clarendon, the arbitrators exceeded their authority. Therefore, the Damage Award in this case should be vacated for the same reasons the award was vacated. *See Collins & Aikman Floor Coverings Corp.,* 736 F.Supp. at 484. In *Collins,* the court found that the arbitrator had exceeded her authority as established in the arbitration provision in the contract between the parties. The provision limited any arbitral award of commissions to those arising from sales prior to termination of the defendant. The arbitrator awarded an amount which could only have been reached by including commissions from sales which occurred after the defendant's termination.

The Court also found that the award was imperfectly executed because there was no determination on which of the accounts commissions were appropriate and that under these circumstances, the award was so imperfectly executed that it could not be reviewed. Because clarification was the proper remedy, the Court remanded the proceedings for further arbitration and clarification in accordance with the opinion. *See also Davis v. Chevy Chase Financial, Ltd.,* 667 F.2d 160 (D.C.Cir.1981) (where the court vacated an arbitration award because the arbitrator exceeded its authority by ruling that the employee was obligated to sell its stock to the employer rather than limiting its ruling to the value of the stock as was required by the arbitration agreement).

In the instant case, the arbitrators did not explain what portion of the Damage Award as regards Issue II was principal and which part was interest. Without this information, this Court is unable to modify the Damage Award to exclude the interest calculation. Therefore, the award will be remanded, and the Panel is directed to exclude the interest which was improperly added to the principal in contradiction of the MOU.

### Issue III is Remanded to the Arbitrators

 The Panel's award on the contingent commission issue cannot be confirmed because it does not specify the amount of damages. On this issue only, the Panel did not render a "mutual, final, and definite award." 9 U.S.C. § 10(a)(4). *See Conntech Development Co. v. University of Connecticut Education Properties Inc.,* 102 F.3d 677, 686 (2d Cir.1996) ("An award is mutual, definite and final if it 'resolve[s] all issues submitted to arbitration, and determine[s] each issue fully so that no further litigation is necessary to finalize the obligations of the parties' "). Issue III will be remanded to the Panel pursuant to 9 U.S.C. § 10(a)(5) for a ruling as to the amount of damages.

It is so ordered.