**JOSEPHTHAL & CO., INC., Plaintiff,**

v.

**CRUTTENDEN ROTH INCORPORATED, (n/k/a Roth Capital Partners, LLC), Defendant.**

**No. 01 CIV. 4551(RWS).**

United States District Court,
S.D. New York.

Nov. 20, 2001.

Zuckerman Spaeder, New York City, By Edward J.M. Little, Esq., Christopher M. Wilson, Esq., Of Counsel, for Plaintiff.

Butler, Fitzgerald & Potter, New York City, By Andrew W. Sidman, Esq., Of Counsel, Kessal, Young & Logan, Long Beach, CA, By John R. Loftus, Esq., Janet Simmons Stemler, Esq., Of Counsel, for Defendant.

## OPINION

SWEET, District Judge.

Defendant Cruttenden Roth Incorporated ("CRI") has moved to enforce an arbitration award, *Cruttenden Roth Incorporated v. Josephthal & Co., Inc.*, NASD No. 99–02841 dated April 26, 2001 (the "Award"), in its favor against plaintiff Josephthal & Co., Inc. ("JCI"). JCI has cross-moved to vacate or modify the Award. For the reasons set forth below, the motion of CRI is granted, the Award is enforced, and the cross-motion of JCI is denied.

### Prior Proceedings

This action was commenced on May 29, 2001 by the petition of JCI to vacate or modify the Award. The instant motion and cross-motion were heard and marked fully submitted on September 6, 2001.

### The Dispute

JCI and CRI are registered broker/dealers which are engaged in public equity transactions and have co-managed equity transactions together.

Beginning in 1995 through February 1999, CRI and JCI worked together on eleven different transactions, including two public offerings of InterVu stock, the

transactions giving rise to the underlying arbitration. JCI had compensation sharing arrangements with respect to all of their transactions that typically involved fees and warrants. The warrants afforded the warrant holder the right to purchase the securities subject to the offerings at a modest amount and/or through a "cashless exercise," and had significant potential value. The fee and warrant sharing arrangements between CRI and JCI for their various transactions were initially determined by oral agreements made on a transaction-by-transaction basis. By the time of the first InterVu offering in November 1997, however, CRI and JCI agreed to a 60/40 split of the underwriting compensation, 60% was allocated to the firm that introduced the transaction to the other, and 40% was allocated to the co-manager.

In November 1997, JCI introduced CRI to an InterVu public in an offering of 2,000,000 shares. CRI was entitled to 40% of the compensation. InterVu delivered 200,000 warrants in connection with the offering; however, CRI received only 60,000 warrants, 30%, and JCI retained 70%, or 140,000 warrants.

After the 1997 InterVu offering, CRI and JCI then co-managed two other offerings during the first part of 1998. These two offerings were also subject to the 60/40 division of underwriter compensation, including warrants.

In 1996 CRI and JCI had co-managed an offering of SkyMall stock and as part of the compensation for the deal, 200,000 warrants were issued and a dispute developed over the allocation of warrants which was resolved upon a JCI commitment as to the warrant allocations for all of their co-managed offerings, including InterVu. On December 30, 1998, JCI and CRI approved a schedule reflecting their prior agreements to divide warrants on all of the public offerings they co-managed. The schedule was incorporated into a written mutual "Release of Claims" also dated December 30, 1998 (the "Release") and signed by principals of the respective firms.

JCI and CRI co-managed InterVu's second public offering of 1,300,000 shares (plus an over-allotment option) in June 1998. This offering involved 130,000 InterVu warrants. JCI received and kept 78,000 warrants and CRI's 52,000 warrant share.

The price of InterVu stock and, therefore, the value of the InterVu warrants rose substantially beginning in March 1999. JCI refused to deliver CRI's InterVu warrants and sought to renegotiate the Release. JCI exercised CRI's 20,000 warrants from the first offering and sold the stock.

### The Arbitration

CRI instituted an action in arbitration before the NASD against JCI in June 1999 alleging that JCI had wrongfully withheld 72,000 InterVu warrants. CRI and JCI are both members of the NASD and, therefore, pursuant to section 10101(a) of the NASD Code of Arbitration Procedure, were required to submit their dispute to binding arbitration. The Statement of Claim alleged three causes of action: breach of express and/or implied contract, intentional, wrongful and tortious exercise of dominion and control over property conversion, and declaratory relief. CRI sought monetary damages based on CRI's trading of the warrants it did receive in April 1999, recovery of the actual 52,000 InterVu warrants still held by JCI and interest, punitive damages and attorneys' fees and costs.

JCI denied all material allegations and further asserted a third-party claim against Scott Weisman, the JCI principal

who signed the Release for breach of fiduciary duty.

Before JCI responded to the arbitration, CRI commenced a proceeding in the New York State Supreme Court in July 1999 pursuant to CPLR Section 7502 to obtain a preliminary injunction to preserve the 52,000 warrants from the second InterVu offering so that the warrants could be delivered to CRI at the time of the arbitration award. The New York State Supreme Court froze the warrants pending the award, and JCI agreed to a stipulation preserving the 52,000 warrants.

In mid-December 1999, JCI asked the Arbitration Panel for an order authorizing it to exercise the 52,000 warrants and sell the stock received. CRI consented to the exercise and in late December 1999, the 52,000 warrants were exercised on a cashless basis (no cost to either party) and 44,448 InterVu shares were received.

The arbitrators issued a ruling on January 17, 2000, permitting JCI, through its affiliate WBM[1] to sell the 44,448 shares and ordered JCI and WBM to place the proceeds in an unencumbered separate escrow account. JCI immediately sold 4,448 InterVu shares at $91.65560 per share and the proceeds of this transaction, $407,705.39, were placed in escrow.

Despite the arbitrators' ruling, CRI continued to believe the InterVu stock should not be sold and urged JCI to agree to a "collar" hedging strategy that used call and put options to preserve the value of the stock and at the same time provide protection against the risk that the market price of the stock might decline. JCI agreed and the parties formalized their agreement in a January 27, 2000 Collar Agreement ("Collar Agreement").

In addition to option strategy, the Collar Agreement provided that the proceeds of the options would be placed in the existing escrow and "follow" to the firm the arbitrators determined was the owner of the underlying InterVu warrants. Specifically, the Collar Agreement states in relevant part:

Each party agrees that, upon a resolution of the ownership of the InterVu shares by a NASD arbitration panel confirmed by a judgment, *the call and put option contracts described will "follow" the owner of the InterVu shares* such that, if [Josephthal] retains ownership of the InterVu Shares, it will retain ownership of the options contracts described above and, if Cruttenden obtains ownership of the InterVu Shares, it will retain ownership of the options contracts. If the InterVu shares are divided between [Josephthal] and Cruttenden, each party will retain or assume ownership of the options contracts ratably.

*Id.* (emphasis added).

The New York State Supreme Court preliminary injunction was then modified to incorporate the Collar Agreement. On March 8, 2000, the state court issued an order that provides, *inter alia:*

ORDERED that ... [o]wnership of Call Proceeds and Put Proceeds, if any, shall follow the ownership of the InterVu Shares in the same manner provided in the Collar Agreement for the Puts and the Calls. *The parties to the Arbitration and WBM shall take such action as may be necessary to transfer the Collar and any Call Proceeds or Put Proceeds to the person determined to be their owner by the Panel in the Arbitration without further award or other action by the Panel in the Arbitration* ...

*Id.* (emphasis added).

The hearing in the underlying arbitration commenced on March 28, 2000, and

---

**1.** WBM ("We Be Money") apparently holds warrants to JCI shareholders.

continued for 28 days through January 5, 2001. CRI's attorneys submitted a "Pre-Hearing Memorandum" dated March 24, 2000 which according to JCI sought to establish the measure of damages to the value of the InterVu warrants at the time of the trial. According to CRI, its memorandum proffered a variety of legal principles intended to guide the arbitrators through the maze of potentially available remedies, including an award of the actual proceeds of the 52,000 InterVu warrants. JCI did not challenge the measure of damages at time of trial contention.

During June 2000, after the arbitration hearing commenced, InterVu stock was liquidated in connection with options positions established pursuant to the Collar Agreement and the subsequent acquisition of InterVu by another company. The proceeds from the sale of the stock, approximately $3.7 million, were placed in escrow.

By the Award, the arbitrators denied CRI's claim for the value of 20,000 InterVu IPO warrants, but granted the CRI claim for the value of 52,000 InterVu secondary warrants, as represented by the total amount of the escrow amount held by Zuckerman, Spaeder, Goldstein, Taylor & Kolker, L.L.P.

### The Award is Affirmed

█ The grounds for vacating arbitration awards are narrow. Courts have consistently held that "arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely settling disputes efficiently and avoiding long and expensive litigation." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d Cir. 1997), *citing Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9 (2d Cir.1997). Moreover, the burden is on the party seeking to vacate the award to establish one of the statutory or judicially created grounds for

that relief. *Dirussa*, 121 F.3d at 821; *Standard Microsystems*, 103 F.3d at 12. Our Circuit firmly adheres to the proposition that an arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is even "a barely colorable justification for the outcome reached." *Landy Michaels Realty Corp. v. Local 32B–32J*, 954 F.2d 794, 797 (2d Cir.1992); *Clarendon Nat. Ins. Co. v. TIG Reinsurance Co.*, 990 F.Supp. 304 (S.D.N.Y.1998).

JCI has contended that the arbitrators acted with "manifest disregard of law" by not measuring CRI's damages at the time of trial as urged initially by CRI and instead enforcing the Collar Agreement.

█ In order to establish "manifest disregard of the law" sufficient to justify the vacatur of an arbitration award, JCI must establish that the arbitrators intentionally ignored what they knew to be obviously applicable and clearly governing law and, further, expressly did so on the record. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933–34 (2d Cir.1986); *see also DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir.1997) (to vacate arbitration on grounds of manifest disregard of the law, the court must find both that arbitrators knew the governing legal principle, yet refused to apply it or ignored it altogether, and the law ignored by the arbitrators was well-defined).

As the *Bobker* court held:

Judicial inquiry under the "manifest disregard" standard is therefore extremely limited. The governing law alleged to have been ignored by the arbitrators must be well defined, explicit and clearly applicable. We are not at liberty to set aside an arbitration panel's award because of an arguable difference regard-

ing the meaning or applicability of laws urged upon it.

*Bobker,* 808 F.2d at 934.

■ With respect to the 52,000 warrants issued in connection with the second InterVu offering, CRI vigorously argued in its Pre–Hearing Memorandum as it had in its claim and through the state court action for an award requiring JCI to deliver the actual property owed to it. By the beginning of the arbitration hearing, the warrants had been exercised and were then represented by 40,000 shares of InterVu stock and the proceeds from the sale of 4,448 shares and CRI claimed entitlement to these assets.

The price of InterVu stock had risen substantially as CRI argued to the panel that JCI should not profit from withholding of CRI's property by an award that allowed JCI to keep the stock and pay CRI some lesser amount. By the time the arbitration hearing was finally completed and an award was issued more than a year later, CRI's claim for the warrants was rendered moot and the value of the warrants was represented by the escrow account and CRI's final damage claim in this regard was based on the value of the escrow and the Collar Agreement.

The Collar Agreement and the order provide that the proceeds of the options positions established pursuant to the Collar Agreement would "follow" to the firm ultimately determined to be the owner of the underlying 52,000 warrants issued in connection with the second InterVu offering.

■ Moreover, an error in applying the "wrong" theory of damages is not a manifest disregard of the law. In *Cole Publishing Co., Inc. v. Wiley & Sons, Inc.,* 1994 WL 532898, 1994 U.S.Dist. LEXIS 13786 (S.D.N.Y.1994), for example, the petitioner asserted that the arbitration panel's award was speculative, and contrary to both New York law and the panel's finding regarding the parties' rights. Petitioner argued that the damage award constituted lost profits, which under governing New York law were available only where they were "reasonably certain" and based on a "stable foundation." The petitioner claimed that such evidence was lacking in the case, and accordingly, the award was entered with "manifest disregard" for the law.

The *Cole* court, however, denied the petition to vacate, noting it was not for the court to reconsider the evidence, but to simply reassure itself that there was some basis for the award.

■ A miscalculation in damages is an insufficient grounds for vacating an arbitration award. *Orion Ship. & Trading Co.,* 206 F.Supp. 777 (1962), *aff'd* 312 F.2d 299 (1963); *see also Clarendon Nat. Ins. Co. v. TIG Reinsurance Co.,* 990 F.Supp. 304 (S.D.N.Y.1998) (miscalculation of damages is not among the narrow grounds on which court may vacate an arbitration award, nor is it grounds for judicial alteration of the award); *B.V.D. Licensing Corp. v. Maro Hosiery Corp.,* 1990 WL 200648, 1990 U.S. Dist. LEXIS 16238 (S.D.N.Y. 1990) (award confirmed despite an alleged miscalculation of damages; miscalculation "does not rise to the level of error which is required to vacate the award").

The Collar Agreement and the New York Supreme Court preliminary injunction provide that the firm determined to be the owner of the InterVu stock retained ownership of the option positions, the proceeds of which were placed in escrow. One who owns option contracts necessarily owns the resulting proceeds from the exercise of the options, as stated by the Collar Agreement.

JCI has also contended that the arbitration panel ignored what was essentially a stipulation between the parties that damages are measured at the time of trial. However, CRI urged throughout the arbitration that the Award should put CRI in the same, or substantially the same, position as it would have been had JCI honored its obligation to deliver the warrants owed to CRI.

■ In addition, JCI disputed CRI's damage calculations and post-hearing briefs opposing CRI's position established that there simply never was an agreement with respect to damages. Although the FAA provides for vacatur of an arbitration award "where the arbitrators exceeded their powers," 9 U.S.C. § 10(a)(4), section 10(a)(4) has consistently been accorded the "narrowest reading." *Amoco Overseas Oil v. Astir Navigation Co.*, 490 F.Supp. 32, 37 (S.D.N.Y.1979). "An award may not be vacated under this subsection on the grounds that the arbitrators' opinion fails to interpret correctly the law applicable to the issues in dispute in the arbitration proceeding, or misinterprets the underlying contract, even if that misinterpretation is 'clearly erroneous.'" *Amoco*, 490 F.Supp. at 37 (citations omitted). Therefore, where a party asserts that the arbitrators exceeded their authority, it must show the actual agreement to arbitrate was exceeded and, as with a claim of manifest disregard of the law, that no proper basis for the award can be inferred from the facts of the case. *Wall Street Associates*, 27 F.3d at 849, *citing Barbier v. Shearson Lehman Hutton, Inc.*, 948 F.2d 117, 121 (2d Cir.1991).

In *Wall Street Associates*, for example, the party challenging the award established that the arbitrators accepted evidence that arguably related to a theory of liability that had been dismissed. The district court, however, refused to vacate the adverse award based on a claim that the arbitrators exceeded their authority. *Wall Street Associates*, 27 F.3d at 849–50. The Second Circuit affirmed on the grounds that several other theories properly before the arbitrators could have supported the award and the basis for the award could not be conclusively determined. *Wall Street Associates*, 27 F.3d at 849.

The Award in this case is justified under any one of the various theories presented by both parties, including under CRI's claim for specific performance or even under the equity argument presented by JCI.

Finally, damage claims are subject to change through liberal amendment rules, *International Paving Systems v. Van–Tulco, Inc.*, 866 F.Supp. 682 (E.D.N.Y. 1994) and a party may completely abandon one damage theory for another. *139 Fifth Avenue Corp. v. Gaillelis*, 1997 WL 277396, 1997 U.S.Dist. LEXIS 7327 (S.D.N.Y.1997). In any event, miscalculation of damages is not among the narrow grounds on which a court may vacate rather than confirm an arbitration award. *Clarendon*, 990 F.Supp. at 310. As previously stated, a miscalculation of damages is not grounds for judicial alteration of an award.

### The Award Will Not Be Modified

JCI has not sought a complete retrial of the merits of CRI's claims or challenged the merits of the decision, the record or the evidence presented in any respect. JCI has requested a modification to require the arbitrators to recalculate damages. There is, however, no basis for such a rehearing under the FAA.

The FAA, 9 U.S.C. § 1 *et seq.*, recognizes only petitions to vacate the entire award, 9 U.S.C. § 10, or petitions to modify an award, 9 U.S.C. § 11. The grounds to modify an award, however, are extreme-

ly limited and exist only where there is an evident material miscalculation or mistake, the award reaching matters not before the arbitrators or there is an error in form. 9 U.S.C. § 11; *see also U.S. Postal Service v. American Postal Workers Union,* 564 F.Supp. 545 (1983). "Manifest disregard of the law," which JCI has asserted here, will simply never justify a request to modify an arbitration award, only as grounds to vacate, which have not been established as set forth above.

*Conclusion*

The motion of CRI to confirm the Award is granted and the JCI cross-motion to vacate or modify the Award is denied. The Award is hereby confirmed.

It is so ordered.