Barbara **STRAWN**

v.

**AFC ENTERPRISES, INC. d/b/a Church's Chicken.**

**No. Civ.A.G–99241.**

United States District Court,
S.D. Texas,
Galveston Division.

Nov. 4, 1999.

---

**719**

Ted C Litton, Royston Rayzor Vickery and Williams, Houston, TX, for Ted C Litton, mediator.

Alton C Todd, Attorney at Law, Alvin, TX, for Barbara Strawn, plaintiff.

Gary Duane Sarles, Sarles and Ouimet, Dallas, TX, for AFC Enterprises Inc, dba Churchs Chicken, defendant.

## ORDER DENYING DEFENDANT'S MOTION TO STAY OR DISMISS AND TO COMPEL ARBITRATION

KENT, District Judge.

On January 7, 1998, Plaintiff Barbara Strawn was allegedly injured in a slip and fall accident within the course and scope of her employment at Defendant's Church's Chicken restaurant in Alvin, Texas. She brought this suit as an original action in this Court, with jurisdiction founded on diversity of citizenship. Now before the Court is Defendant's Motion to Stay or Dismiss and to Compel Arbitration, brought pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16. For the reasons set forth below, Defendant's Motion is **DENIED.**

### I. FACTUAL SUMMARY

Defendant AFC Enterprises, d/b/a Church's Chicken, is a non-subscriber to the Texas Workers' Compensation Act. Rather than provide workers' compensation insurance coverage, AFC established the America's Favorite Chicken Company Texas Employee Injury Benefit Plan (the "AFC Plan"). Under the AFC Plan, employees injured or killed in the course and scope of their employment are entitled to limited medical, wage-replacement and death benefits. Acting pursuant to the terms of the AFC Plan, Defendant has paid Plaintiff about $22,500 in wage-replacement benefits, and about $24,000 in medical benefits.

Defendant seeks to steer any and all disputes that may arise between an employee and AFC into binding arbitration. Defendant accomplishes this goal by re-quiring all prospective employees to sign the Value Deal Agreement as a condition of their employment. The Value Deal Agreement provides that "all claims and disputes Employee may presently have or may in the future have" against Defendant, expressly including "claims for bodily injury or physical, mental or psychological injury" must be submitted to binding arbitration. The parties do not dispute that Barbara Strawn signed the Value Deal Agreement on August 14, 1997.

The AFC Plan and the Value Deal Agreement work in tandem, each referencing the other. In particular, the AFC Plan is designed to provide a heightened level of benefits to employees who sign the Value Deal Agreement and agree to submit claims to an arbitral forum.

Of great significance to the following analysis, the AFC Plan provides minimal benefits, as compared to those available under the Texas Workers' Compensation Act. The differences between the benefits provided under the AFC Plan and the Workers' Compensation Act are striking. Under the Act, an employee is entitled to lifetime medical benefits, without limitation on amount. Under the AFC Plan, the employee is entitled to only 26 weeks of benefits, or 104 weeks of benefits if he has signed a Value Deal Agreement. Employees under the Act can recover a percentage of their wages based on their degree of medical impairment; no such benefits for impairment are provided under the AFC Plan. Under the Act, an employee could receive as much as 80% of his average wage for up to 401 weeks as long term wage replacement benefits; the AFC Plan has no such provision. For severe injuries, the Act provides for up to 75% of the pre-injury wage amount for life; the AFC Plan provides no such benefits. For workers killed in the course of their employment, the Act provides benefits at the same rate as lifetime benefits. The AFC Plan provides no death benefits at all unless the employee has signed a Value Deal

Agreement, and then benefits are limited to twice the employee's pre-injury annual pay, up to an absolute maximum of $75,-000.

Defendant does not really dispute that the AFC Plan provides minimal benefits as compared to those available under the Texas Workers' Compensation Act. Indeed, Defendant boldly asserts that a non-subscribing employer is "not required to offer *any* benefits for on the job injuries" (emphasis added). According to Defendant, the sparse level of benefits under the AFC Plan is "consistent with Texas public policy, because AFC pays at least limited benefits without regard to fault." Defendant further argues that the *combination* of the limited benefits under the AFC Plan, coupled with the mandatory arbitration requirement of the Value Deal, is not contrary to public policy. In fact, Defendant goes so far as to claim that "AFC could have unilaterally imposed the Value Deal Agreement on its employees as a condition of employment without offering any benefits whatsoever."

### II. The Analytical Standard

■ When adjudicating a motion to compel arbitration under the Federal Arbitration Act, the Court conducts a two step analysis. The first step has two sub-parts: the Court is to determine a) whether the parties agreed to arbitrate the dispute in question, and b) whether the dispute in question falls within the scope of the agreement to arbitrate. *See Webb v. Investacorp, Inc.,* 89 F.3d 252, 257–58 (5th Cir.1996). The second step of the *Webb* analysis involves deciding "whether legal constraints external to the parties agreement foreclosed the arbitration of those claims." *Id.* (*quoting Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3355, 87 L.Ed.2d 444 (1985).

■ Because federal policy favors arbitration, when analyzing step 1(b), ambiguities as to the scope of the arbitration clause are to be resolved in favor of arbi-

tration. *See Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.,* 489 U.S. 468, 475–76, 109 S.Ct. 1248, 1253, 103 L.Ed.2d 488(1989); *Webb,* 89 F.3d at 258. And because federal policy favors arbitration, parties can agree to arbitrate a wide variety of disputes. Consequently, an analysis of step 1(a) is likewise biased towards finding in favor of arbitrability. The Supreme Court has held that even disputes involving statutory rights can be arbitrable. *See Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 26, 111 S.Ct. 1647, 1652, 114 L.Ed.2d 26 (1991). This conclusion is based on the principle that "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial forum." *Mitsubishi Motors,* 473 U.S. at 628, 105 S.Ct. at 3354.

■ In keeping with the strong federal policy in favor of arbitration, many disputes about the enforceability of an arbitration clause are themselves to be resolved in an arbitral forum. Thus the fact that a party makes a credible showing of duress or fraud, or argues that an arbitration clause is unconscionable, may not be enough to prevent a Court from finding in favor of arbitration under step 1(a). *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402–04, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967). Under the *Prima Paint* rule, if the complaint is directed against the contract *as a whole,* the enforceability of the arbitration provisions contained within the contract are to be decided by the arbitrator. *See id.* Thus under step 1(a), for a court to find an arbitration clause unenforceable, the dissatisfied party must confine his attack to the arbitration clause itself. *See id.* For example, if a party claims that the signature on an employment contract was obtained by fraud, the enforceability of an arbitration clause found within that employment contract is to be decided by the arbitrator, because the attack goes to

the contract as a whole. But if the complaint is that the arbitration clause *itself* was obtained by fraud, then it is for a court, and not an arbitrator, to decide on the enforceability of the arbitration provision. *See id.*

While there is a strong federal policy in favor of arbitration, there are limits to this policy. The FAA by its own terms allows some arbitration agreements to be rendered unenforceable by neutral principles applicable to contracts generally. The FAA makes most arbitration agreements "valid, irrevocable, and enforceable *save upon such grounds as exist at law or in equity for the revocation of any contract.*" 9 U.S.C. § 2 (emphasis added). It is the second step of the *Webb* analytical framework which addresses this possibility. Notwithstanding the fact that an arbitration agreement is otherwise valid (*Webb* step 1(a)) and that the dispute is within the scope of the agreement (*Webb* step 1(b)), an arbitration agreement can still be invalidated under the second step of the *Webb* analytical framework due to "legal constraints external to the parties' agreement." *See Webb*, 89 F.3d at 257–58.

■ Thus there are two independent ways to attack the enforceability of an arbitration agreement which appears to cover the underlying dispute between the parties. A party can attack the arbitration clause under step 1(a), and if the complaint is directed at the arbitration clause in isolation, the court will decide if it is enforceable; whereas if the complaint is directed at the entire contract, an arbitrator will decide if it is enforceable. *See Prima Paint*, 388 U.S. at 402–04, 87 S.Ct. at 1805–06. Alternatively, a party can mount a more global challenge to the arbitration agreement under step 2, arguing, for example, that the agreement is void as against public policy. "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]." *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 1656, 134 L.Ed.2d 902 (1996).

### III. Analysis

#### 1) The Position of the Parties

The Defendant contends that the Value Deal arbitration agreement is absolutely valid and enforceable. As authority for this proposition, Defendant calls the Court's attention to a variety of cases, including *Cupit v. Walts,* 90 F.3d 107, 109 (5th Cir.1996) (upholding a collective bargaining agreement between a union and a non-subscribing employer in which the employees agreed to waive their right to pursue common law negligence actions in exchange for employer provided benefits comparable to those available under the Texas Workers' Compensation Act); *Duran v. Intex Aviation Services, Inc.,* No. 95–CV–0403–R (N.D.Tex. Nov. 8, 1995) (unpublished opinion), *aff'd without published opinion,* 1996 WL 556967, 98 F.3d 1339 (5th Cir.1996) (upholding summary judgment against an employee who claimed she did not understand the legal effect of a waiver of the right to sue, or in the alternative, that the waiver was obtained under duress); *Gutierrez v. Academy Corp.,* 967 F.Supp. 945 (S.D.Tex.1997) (Kent, J.) (granting motion to compel arbitration in a Title VII discrimination case); *Brito v. Intex Aviation Services, Inc.,* 879 F.Supp. 650 (N.D.Tex.1995) (upholding validity of a purely voluntary employee occupational insurance plan which, if accepted, became the exclusive remedy for job related injuries); *Kinnebrew v. Gulf Ins. Co.,* No. 94–CV–1517–R, 1994 WL 803508 (N.D.Tex. Nov.28, 1994) (compelling arbitration of employee's sex discrimination claim); *Martinez v. IBP, Inc.,* 961 S.W.2d 678 (Tex.App.—Amarillo 1998, writ denied) (upholding an employee's waiver of common law causes of action made in settlement of claims after the injury had occurred).

Defendant's principal argument begins with the observation that these cases up-

held the validity of an employee's out and out *waiver* of his statutory or common law right to sue. Because Defendant has not required Church's Chicken employees to waive any right to sue, employees are still free to supplement the meager benefits available under the AFC Plan by pursuing tort claims against Defendant, albeit in an arbitral, not a judicial forum. Defendant concludes that if an out and out waiver of the right to sue can be valid, requiring an employee to consent to a "mere" agreement to arbitrate his tort claims must be valid as well.

In the alternative, Defendant argues that if the Value Deal agreement is found to be voidable, then the Plaintiff has ratified the agreement by accepting nearly $47,000 of benefits under the AFC Plan. Finally, relying on *Prima Paint*, Defendant further argues that any doubts as to the enforceability of the arbitration agreement should be resolved by an arbitrator, not this Court.

The Court understands the Plaintiff to be arguing that the *combination* of a unilaterally imposed arbitration agreement with a benefit plan significantly inferior to that available under the Workers' Compensation Act is void as against Texas public policy. Plaintiff's position is that it is permissible for an employer to offer a benefit plan comparable to that under the Workers' Compensation Act while also requiring employees to waive statutory or common law causes of action. An employee under such a scheme is no worse off than his counterpart under a workers' compensation plan. And it may be permissible for a non-subscribing employer to offer a miserly benefit plan provided no further restrictions are imposed, because this leaves an injured employee free to supplement his ultimate recovery by pursuing tort claims in a judicial forum. But Plaintiff contends that it is not permissible to offer benefits significantly inferior to those available under the workers' compensation system, and simultaneously force an injured employee seeking to sup-plement his recovery into an arbitral forum.

In support of this position, Plaintiff relies primarily on two cases: *Reyes v. Storage & Processors, Inc.*, 995 S.W.2d 722 (Tex.App.—San Antonio 1999, pet. for rev. filed) and *Cupit*, 90 F.3d at 109. The *Reyes* court held that a waiver of an employee's common law causes of action was void as against public policy where the employees were given benefits substantially less generous than those available under the Workers' Compensation Act. *See Reyes*, 995 S.W.2d at 727–28. The *Cupit* court held that an "agreement between a non-subscribing employer and its employees whereby the non-subscribing employer contractually obligates itself to provide benefits to its employees *equal to or greater* than those provided under the Texas Workers' Compensation Act is a valid and enforceable contract." *Cupit*, 90 F.3d at 109 (emphasis added). Thus by negative implication, *Cupit* supports the conclusion that a non-subscribing employer's benefit plan which is substantially less generous than what is available under the Texas Workers' Compensation Act may not be valid.

### 2) The Public Policy Underlying the Workers' Compensation Act

■ The Court finds Plaintiff's argument to be persuasive. For purposes of this analysis, the Court assumes that the arbitration agreement is otherwise valid (*Webb* step 1(a)), and also assumes that the broad language in the Value Deal agreement covers the tort claims here in dispute (*Webb* step 1(b)). *See Webb*, 89 F.3d at 257–58. But the Court is convinced that the arbitration agreement fails to pass muster under the second step of the *Webb* analytical test because the agreement is void as contrary to Texas public policy with respect to the workers' compensation system.

At common law, an injured employee could pursue a tort claim against his employer, and stood to recover if he demon-

strated that his injuries were proximately caused by the employer's negligence. *See Texas Workers' Compensation Commission v. Garcia,* 893 S.W.2d 504, 521 (Tex. 1995); *Reyes,* 995 S.W.2d at 726. However, the employer could defend using the fellow servant, contributory negligence, and assumption of the risk doctrines. In practice, these proved formidable defenses, often defeating recovery.

Reacting to the perceived inequities of this system, the Texas Legislature enacted the Texas Workers' Compensation Act. Tex.Lab.Code Ann. § 401.001 *et seq.* If an employer elects to subscribe to the workers' compensation system, its employees are permitted to waive their common law and statutory causes of action, in exchange for which they become entitled to limited but certain benefits under the Act, and without any requirement of proving the employer's negligence. *See Garcia,* 893 S.W.2d at 521; *Reyes,* 995 S.W.2d at 726. The Texas Legislature thus offered an employer the ability to avoid potentially significant common law and statutory liability in exchange for providing his employees with fixed and relatively modest benefits without regard to fault.

In Texas, an employer is not required to subscribe to the workers' compensation system, but there are penalties associated with not subscribing. Opting out of the system is discouraged by eliminating all the common law defenses previously available to the employer, thus exposing the employer to a heightened probability of tort liability. *See Garcia,* 893 S.W.2d at 521; *Reyes,* 995 S.W.2d at 726.

The Texas Legislature clearly intended a balanced exchange between the employee and the employer. But there is always the potential for abuse, and courts must be vigilant in policing such abuses. "The Texas Workers' Compensation Act was enacted primarily for the benefit and protection of employees." *See Hazelwood v. Mandrell Industries Co.,* 596 S.W.2d 204, 206 (Tex.App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.) For example, a non-sub-

scribing employer cannot contract to provide only the limited workers' compensation benefits without also agreeing to waive its common law defenses should the employee decide not to enroll in the plan, thereby retaining his common law and statutory causes of action. *See id.* Likewise, "public policy does not permit an employer to reap the principal benefit of providing workers' compensation coverage—the waiver of an injured employee's common law and statutory claims—without also bestowing on the injured employee the principal benefit for which that waiver is the 'quid pro quo'—the limited but certain benefits guaranteed by workers' compensation insurance coverage." *Reyes,* 995 S.W.2d at 727–28. The *Reyes* court rejected, as against public policy, the waiver of an employee's common law and statutory claims obtained by offering benefits substantially less generous than those provided by the workers' compensation scheme. Significantly, the benefits rejected as inadequate in *Reyes* were actually more generous than those offered by Defendant AFC.

In attempting to distinguish *Reyes, Hazelwood* and other cases, Defendant makes much of the distinction between, on the one hand, a waiver of an employee's right to pursue common law and statutory claims, and, on the other hand, an agreement to arbitrate claims in a non-judicial forum. The Court is unpersuaded that this distinction is as significant as Defendant claims.

According to Defendant, "AFC could have unilaterally imposed the Value Deal Agreement on its employees as a condition of employment without offering any benefits whatsoever." This argument surely proves too much. Defendant could not have unilaterally imposed a requirement that prospective employees waive all common law and statutory causes of action in exchange for no benefits whatsoever. *See Reyes,* 995 S.W.2d at 727–28; *Hazelwood,* 596 S.W.2d at 206; *see also Cupit,* 90 F.3d at 109. Such a one-sided arrangement

would be contrary to Texas public policy with regard to worker's compensation coverage, because it undermines the proper "quid pro quo" exchange envisioned by the legislature. If the "balance is tipped so that the employee's benefits under the statute are substantially reduced, the clear intent of the legislature is thwarted." *Hazelwood*, 596 S.W.2d at 206. Likewise, allowing an employer to unilaterally impose an arbitration agreement in exchange for miserly benefits can only be consistent with public policy if the arbitral forum is enough like the judicial forum that the "quid pro quo" exchange desired by the Texas Legislature is not significantly undermined. Otherwise, a non-subscribing employer could, as Defendant claims, offer an employee "no benefits whatsoever", unilaterally impose an arbitration agreement as a condition of employment, and thereby force the employee to seek his only supplemental remedies in a perhaps vastly different arbitral forum. The Legislature thought that stripping a non-subscribing employer of his common law defenses and allowing an injured employee to sue in a *judicial* forum was a disincentive adequate to prevent an excessive number of employers from opting out of the workers' compensation system. Thus whether a non-subscribing employer can unilaterally consign an injured employee to an arbitral forum without thwarting the intent of the Legislature depends on how similar an arbitral forum is to a judicial one.

Without intending in any way to impugn the integrity or competence of arbitrators, the Court finds that an arbitral forum is not sufficiently similar to a judicial forum to prevent thwarting the clear intent of the Texas Legislature in enacting the Workers' Compensation Act. Most obviously, an arbitral forum does not permit an employee to have his claim heard by a jury. Forcing a non-subscribing employer, deliberately shorn of common-law defenses, to defend himself before a jury is the sort of disincentive the legislature presumably had in mind when they designed a scheme to minimize the number of employers electing to opt out of the workers' compensation system.[1] Contrary to Defendant's claims, the fact that Plaintiff Barbara Strawn, for whatever reason, chose to waive her right to a jury trial in this particular case is irrelevant to the Court's public policy analysis. "In considering whether a contract is contrary to public policy, the test is whether the tendency of the agreement is injurious to the public good, not whether its application in a particular case results in actual injury." *Hazelwood*, 596 S.W.2d at 206.

Another significant difference between a judicial and an arbitral forum is that the rules of evidence are significantly relaxed in an arbitral forum. "As a speedy and informal alternative to litigation, arbitration resolves disputes without confinement to many of the procedural and evidentiary strictures that protect the integrity of formal trials." *Forsythe Int'l, S.A. v. Gibbs Oil Co. of Texas*, 915 F.2d 1017, 1022 (5th Cir.1990). Likewise, and again without intending to cast doubt on the competence of arbitrators generally, the level of legal expertise required to become an arbitrator is significantly different from that required to become a Texas state or federal judge. Clearly, stripping a defendant of common law defenses is not much of a disincentive in practice if the rules of evidence employed in the forum fail to properly protect an injured employee's chances for recovery, or if the legal expertise of those conducting the proceedings are not adequate to allow the employee to vindicate the technical legal advantages the Texas Legislature saw fit to bestow on the employees of a non-subscribing employer. As is

---

1. Obviously, this analysis does not hinge on concerns about a plaintiff's right to a jury trial under the Seventh Amendment. Instead, the possibility that a jury might sit as the factfinder in a judicial forum is relevant only insofar as it may have influenced the Texas legislature's calculation of the proper level of disincentives necessary to prevent an excessive number of employers from opting out of the workers' compensation system.

widely recognized, parties in an arbitration proceeding may find that "the results of arbitration by private and untrained 'judges' are distantly remote from the fair process procedurally followed and application of principled law found in the judicial process." *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 751 (8th Cir. 1986). Although parties are free to accept this different brand of justice in many situations, a non-subscribing employer cannot simultaneously offer minimal benefits and also unilaterally impose such a distinct forum on an its injured employees without subverting the properly balanced "quid pro quo" exchange desired by the Texas Legislature.

█ Another striking difference is the limited level of judicial review available in an arbitral forum. Under the FAA, a court reviews arbitral decisions under an extremely deferential standard, one that has been called "among · the narrowest known to the law." *Litvak Packing Co. v. United Food & Commercial Workers, Local Union No. 7*, 886 F.2d 275, 276 (10th Cir.1989). Errors in the interpretation or the application of the law are not a sufficient basis to vacate an arbitration award. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 370–71, 98 L.Ed.2d 286 (1987). The grounds for vacatur under § 10 of the FAA are quite limited.[2] Recognizing the limited extent of judicial review of arbitration awards, some Circuits have created nonstatutory grounds for reviewing awards, and will vacate awards if they exhibit "manifest disregard" for the law, or are "arbitrary and capricious." *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 936 (2nd Cir.1986) (applying "manifest disregard" standard).

However, the Fifth Circuit has refused to develop nonstatutory grounds for review, so within this Circuit, the potential for review is extraordinarily limited. *See R.M. Perez & Associates v. Welch*, 960 F.2d 534, 539–40 (5th Cir.1992) (rejecting the "manifest disregard" standard). The significance of limited judicial review, of course, is that when the Legislature was contemplating the proper level of disincentives required to minimize the number of employers who elect to opt out of the workers' compensation system, the Legislature presumably would have assumed the existence of the ordinary level of appellate scrutiny. Employers would recognize they could not escape liability if an injured employee was prejudiced by obvious errors of law in the trial court. The employer would calculate that, given effective judicial review of lower court decisions, any such victory would be short-lived. Thus once again it is hard to see how a non-subscribing employer can unilaterally consign an employee to an arbitral forum, with little possibility of effective judicial review, without subverting the system of incentives and the properly balanced "quid pro quo" intended by the Legislature in enacting the workers' compensation system.

It is true that an arbitral forum is at least formally adequate for vindicating even statutory rights. *See Gilmer*, 500 U.S. at 26, 111 S.Ct. at 1652. But the formal adequacy of the arbitral forum in general is not at issue in this particular case. The Court instead finds that, where employers offer minimal benefits and unilaterally impose an arbitral forum on their injured employees, such a forum is sufficiently dissimilar to a judicial forum as to undermine Texas public policy with re-

---

**2.** The grounds include 1) where the award was procured by corruption, fraud, or undue means; 2) where there was évident partiality or corruption in the arbitrators; 3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or

of any other misbehavior by which the rights of any party have been prejudiced; 4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made. *See* 9 U.S.C. § 10.

spect to the workers' compensation system. Consequently, the Court finds that the Value Deal Agreement, which relegates to an arbitral forum all Church's Chicken employees seeking to supplement their meager benefits, is void as against public policy.

### 3) Defendant's Arguments and Authorities

The Court is not persuaded by the arguments Defendant has offered in opposition to this conclusion. There appears to be no Fifth Circuit authority which stands squarely in the way of the Court's conclusion. Contrary to Defendant's suggestion, *Cupit* offers more support to Plaintiff's position than to Defendant's. Although the *Cupit* court rejected plaintiff's public policy challenge to an agreement in which employees waived their common law causes of action, the court limited its holding to plans "whereby the non-subscribing employer contractually obligates itself to provide benefits to its employees equal to or greater than those provided under the Texas Workers' Compensation Act." *Cupit*, 90 F.3d at 109. The implication is that requiring a waiver in exchange for benefits substantially less generous than those available under the workers' compensation system might *not* withstand a public policy challenge. This conclusion is further strengthened by the fact that the *Cupit* court felt the necessity to limit its holding despite the fact that *Cupit* involved a collective bargaining agreement worked out between a union and the non-subscribing employer. *See id.* at 108. If the *Cupit* court felt the necessity to limit its holding even in a case where there was much greater equality of bargaining power between the unionized employees and the employer, then there is all the more reason to conclude that the Value Deal agreement unilaterally imposed by Defendant on individual, non-unionized employees raises serious public policy concerns.

Defendant submitted for the Court's review a copy of the Fifth Circuit's unpublished *Duran* opinion which was associated with the table affirmance of the trial court's decision. *See Duran*, 98 F.3d 1339 (table affirmance). However, the *Duran* opinion provides little support for Defendant's position. The Fifth Circuit expressly declined to rule on plaintiff's argument that a waiver might be void as against public policy, because the plaintiff failed to raise this argument in the trial court.

This Court's *Gutierrez* opinion is distinguishable. The plaintiff in *Gutierrez* unsuccessfully sought to avoid an arbitral forum for her Title VII employment discrimination claim. *See Gutierrez*, 967 F.Supp. at 946. Because the plaintiff in *Gutierrez* suffered no personal injuries, the level of benefits available to an injured worker were not relevant, and therefore there was no need to analyze the public policy concerns underlying the Texas Workers' Compensation Act.

However persuasive and well-reasoned cases such as *Kinnebrew* and *Brito* may be, they are not binding as precedent on this Court. In any event, the *Kinnebrew* case is inapposite, for the same reason *Gutierrez* is: the plaintiff in *Kinnebrew* was pursuing a sex discrimination claim, not a personal injury claim. *See Kinnebrew*, 1994 WL 803508 at *1. The *Brito* case is also inapposite, because the plan upheld there was *entirely voluntary*, and there were no allegations that the benefits available under the plan were significantly less than those offered under a workers' compensation plan. *See Brito*, 879 F.Supp. at 654, n. 4. Judge McBryde went out of his way to note that "[a]n employee ... has a choice about whether to enroll in the plan. His employment status is unaffected by the choice he makes.... Accordingly, the main purpose of the Act, to protect and benefit the employee, is not contravened by the existence of the plan and its concomitant waiver." *Id.*

The *Martinez* case is likewise inapposite. The *Martinez* court upheld a waiver agreement entered into *after* the employee was injured. *See Martinez*, 961 S.W.2d at

684. An agreement made after an employee is injured is more like an attempt to settle or compromise a lawsuit, because the extent of the employee's injury and the nature of his claims are known by both parties. Such an agreement is quite different from the arbitration agreement Defendant AFC unilaterally imposes before an employee is even injured.

 Defendant argues that even if the Value Deal Agreement is considered voidable, Plaintiff has ratified it by accepting $47,000 of benefits under the AFC Plan. This argument fails, because the Court has found the Value Deal Agreement void, not merely voidable. *See Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 118 S.Ct. 838, 843–44, 139 L.Ed.2d 849 (distinguishing between a voidable contract, which may be ratified, and a contract void as against public policy, which cannot be ratified).

 Defendant also attempts to invoke the *Prima Paint* rule by drawing on the distinction between an attack focused on an arbitration clause in isolation, and a general attack on a contract which happens to contain an arbitration clause. According to Defendant, because Plaintiff has failed to attack the Value Deal arbitration agreement in isolation, the validity of the Value Deal agreement is itself a question that should properly be decided by an arbitrator, not this Court. The Court disagrees. In the first place, the *Prima Paint* rule is applicable to step 1(a) of the *Webb* analysis, not the second step. *See R.M. Perez & Assocs.,* 960 F.2d at 537 (5th Cir.1992) (applying the *Prima Paint* analysis to step 1(a) of the *Webb* analysis). Since the Court's analysis turns on the second step of the *Webb* analysis, the *Prima Paint* rule is not implicated. But even if the *Prima Paint* rule applies when a party attacks the validity of the arbitration agreement under the second step of the *Webb* analysis, the Court construes Plaintiff to be attacking the Value Deal agreement in isolation. The Value Deal is an entirely separate document, not a clause contained within a larger employment contract addressing many other issues. The Value Deal agreement is concerned almost exclusively with establishing arbitration as the means for resolving disputes between the parties. Plaintiff's public policy argument is that requiring an employee to sign the Value Deal agreement under the circumstances of this case thwarts the will of the Texas Legislature. Because Defendant would be free to offer the modest benefits under the AFC Plan in the absence of the Value Deal agreement, Plaintiff's complaint is directed to the Value Deal agreement in isolation. Consequently, under the *Prima Paint* rule, it is for the Court, not an arbitrator, to assess whether the Value Deal agreement contravenes the public policy of Texas.

 Finally, although Defendant does not quite make this argument, it is worth addressing anyway. It is true that the FAA preempts any state law which has the effect of putting an agreement to arbitrate on a "lesser footing" than an ordinary contract. "What states may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the Act's language and Congress' intent." *Allied–Bruce Terminix Companies v. Dobson,* 513 U.S. 265, 281, 115 S.Ct. 834, 843, 130 L.Ed.2d 753. Consequently, the Fifth Circuit has held that the FAA preempts the requirement of Section 171.002 of the Tex.Civ.Prac. & Rem.Code, which makes arbitration agreements covering personal injury actions enforceable only if signed by counsel for each party. *See Miller v. Public Storage Mgmt., Inc.,* 121 F.3d 215, 219 (5th Cir.1997). Section 171.002 is clearly preempted because "Congress precluded states from singling out arbitration provisions for suspect status." *Doctor's Associates,* 517 U.S. at 687, 116 S.Ct. at 1656.

But preemption is not at issue in this case. The Court's holding does not put an arbitration agreement on an unequal footing with respect to ordinary contracts. Instead, the Court has found that an arbitration agreement, in these circumstances, violates the public policy underlying the Texas Workers' Compensation Act. As *Hazelwood* and *Reyes* illustrate, an ordinary employment contract can be invalidated on precisely the same basis. Consequently, the Court's holding treats an arbitration agreement no better, and no worse, than an ordinary contract which impermissibly thwarts the legislative intent behind the Workers' Compensation Act.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Stay or Dismiss and to Compel Arbitration is **DENIED.** The Parties are **ORDERED** to file no further pleadings on this issue, including motions to reconsider and the like. The parties are **ORDERED** to bear their own taxable costs and expenses incurred herein to date. **IT IS SO ORDERED.**